The ARUNDEL CORPORATION

v.

The UNITED STATES.

No. 24–73.

United States Court of Claims.

May 14, 1975.

Richard H. Nicolaides, Washington, D. C., atty. of record, for plaintiff; J. Cookman Boyd, Jr., Baltimore, Md., of counsel.

Ray Goddard, Washington, D. C., with whom was Acting Asst. Atty. Gen. Irving Jaffe, for defendant.

Before COWEN, Chief Judge, and KASHIWA and BENNETT, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

**PER CURIAM:**

This case comes before the court on plaintiff's request, filed November 1, 1974, for review by the court of the recommended decision, filed August 2, 1974, by Trial Judge Thomas J. Lydon, pursuant to Rule 166(c) on plaintiff's motion and defendant's cross-motion for summary judgment and on defendant's motion, filed January 14, 1975, for adoption by the court of the recommended decision. The case has been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case. It is, therefore, concluded that plaintiff is not entitled to recover, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted and plaintiff's petition is dismissed.

## OPINION OF TRIAL JUDGE

LYDON, Trial Judge:

On December 6, 1965, plaintiff entered into a contract with defendant, acting through the Department of the Army, Jacksonville, Florida District, Corps of Engineers, wherein it agreed to construct, for the contract price of $1,814,258, some 10.4 miles of levee along the northeast side of Lake Okeechobee in Martin and Okeechobee Counties, Florida. The levee, designed for flood protection purposes, was to be constructed from material to be obtained from a continuous borrow area parallel to and on the landside of the levee. During excavation of the borrow material, plaintiff alleged that it had encountered changed conditions materially different from subsurface conditions indicated in the contract documents. Specifically, plaintiff alleged it encountered a materially greater quantity of rock than was indicated by the contract documents. Plaintiff's claim based on changed conditions was denied by the contracting officer on August 28, 1968, and thereafter denied by the Corps of Engineers Board of Contract Appeals (hereinafter the Board) on January 8, 1971 (71–1 BCA # 8669). Plaintiff herein seeks review of the Board's decision that it did not encounter changed conditions during contract performance pursuant to the standards of the Wunderlich Act (68 Stat. 81 (1954), 41 U.S.C. §§ 321 and 322 (1970)). Plaintiff maintains that the Board's decision was arbitrary and not supported by substantial evidence. It claims entitlement

to compensation for 97 additional working days resulting from the changed conditions it encountered in the amount of $1,422,242. In the alternative, plaintiff contends it is at least entitled to compensation for 82 additional working days in the amount of $1,202,366. After a careful review of the administrative record and the briefs of the parties, it is concluded that the Board's determination that plaintiff did not encounter changed conditions[1] during contract performance is entitled to finality in accordance with the Wunderlich Act.

## I.

■ Plaintiff's Florida District Manager, James W. Wilkerson (Wilkerson) was responsible for assembling information pertinent to the submission of plaintiff's bid on the proposed levee work. In this bid preparation work, Wilkerson considered information germane to the borrow area from a number of sources, including 26 boring logs furnished as contract documents by defendant,[2] 15 additional borings at locations which were between or offset from the 26 Government borings referred to above made by plaintiff during its prebid site investigation, and pertinent geological publications and maps from both the United States Geological Survey and the State of Florida Geological Survey. Wilkerson was not a geologist, but had considerable experience in dredge excavation work.[3] The Board found, and it is uncontested herein, that plaintiff made an adequate prebid site investigation and that the contract documents fairly represented the information available to defendant as to site and subsurface conditions at the various core boring locations. Nor is there any dispute that the subsurface investigations made by the Government, as manifested in logs of 26 core borings within or immediately adjacent to the continuous borrow area, properly portrayed the subsurface condition at each bore hole location and that there were medium hard, hard and very hard formations of rock, among other materials, within the limits of the borrow area. Moreover, it is clear that plaintiff's borings in general confirmed the data reflected in the Government's borings. Indeed, the additional borings made by plaintiff demonstrated that the various strata reflected in the Government's boring logs were discontinuous and subject to material variations within relatively short distances.

1. Plaintiff advised in its moving brief that the sole issue in this case is whether or not the conditions encountered by plaintiff during contract performance materially differed from those indicated in the contract documents. The Changed Conditions (Article 4) clause of the contract in question provided in pertinent part:

"The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of (a) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (b) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract * *.".

Subpart (a), *supra,* is referred to as a "Category 1" changed condition and subpart (b) is referred to as a "Category 2" changed condition. While there is loose language in the briefs implying that both categories are involved in this case, it is concluded that the dispute is only concerned with a Category 1 changed conditions claim.

2. Plaintiff made no effort to examine the core borings themselves although they were available for inspection and the Invitation for Bids invited inspection thereof. The core borings were subsequently lost and not available at the time of the Board hearing. Whether their availability would have made a difference in the result reached, or the rationale employed, by the Board is pure conjecture.

3. In some instances it has been found necessary to supplement the facts as recited by the Board for purposes of explanation, clarity of presentation or proper perspective. This is permissible in Wunderlich Act review proceedings as long as the supplementary facts are undisputed or uncontroverted. *See e. g.,* Liles Constr. Co. v. United States, 455 F.2d 527, 537, 197 Ct.Cl. 164, 183 (1972); Maxwell Dynamometer Co. v. United States, 386 F.2d 855, 859, 870, 181 Ct.Cl. 607, 612–13, 631 (1967).

In his bid preparation work, Wilkerson divided the borrow area into nine sections and calculated the number of days he estimated it would take to excavate each section. Wilkerson's time projections were based on his estimate of the ratio of easily dredged material to the indicated quantity of rock manifested by the subsurface information available to him. Wilkerson placed great reliance, in arriving at his estimates, on past production records on other excavation projects performed with a hydraulic dredge called the "Admiral." He also relied on his own prior experience in dredging work. His own prior experience took on greater import when a new hydraulic dredge, called "The General," which had never been used previously, was scheduled for use on this project. Accordingly, prior production records of work done by the Admiral were less significant than would be the case if the Admiral had been assigned to the levee project. With the new dredge, Wilkerson had to rely on its anticipated unproven design capacity. Wilkerson's daily estimated volume of excavation production was 48,000 cubic yards in sections evaluated as 98 percent or more sand, 38,000 cubic yards in sections evaluated as having 12 to 14 percent rock, and 22,000 cubic yards in section 9, where the boring logs indicated some 31.7 percent rock. Wilkerson estimated that 240 days would be required to excavate the estimated 9,671,700 cubic yards of material in the borrow area. This would indicate that plaintiff would have to excavate an average of 40,300 cubic yards per day. The fact that the dredge was used in the borrow area a total of 97 days more than the estimated 240 days is claimed by plaintiff to be due solely to the presence of changed conditions.

Dredging operations began on April 1, 1966, and work proceeded smoothly through sections 1, 2 and 3. The Government's boring logs for the area covered by these sections (station 924 + 30 through 746 + 50) indicated that no rock would be encountered and plaintiff found that the material actually excavated corresponded with the data reflected on the logs. While working in section 4, on or about July 14, 1966, plaintiff contends it began to encounter substantially greater quantities of rock than it believed was indicated in the contract documents. With the exception of some eleven days in November 1966, plaintiff alleged it continued to experience more rock than it anticipated until it completed its dredging operations on or about March 11, 1967.[4]

There are two separate areas in which plaintiff claims it encountered changed conditions. The first area is located between stations 746 + 50 and 568 + 50 (sections 4 and 5) and involved work performed from July 14, 1966 until November 11, 1966. The Government's boring logs indicated the presence of rock in these sections in varying degrees and at varying depths. The second area is located between stations 540 and 401 + 50 (sections 7, 8 and 9) and involved work performed from November 25, 1966 to March 11, 1967. The Government's boring logs indicated the presence of rock in these sections in varying degrees and at various depths.

In light of the rock indications on the contract boring logs, plaintiff did not contend that the presence of rock in the borrow area constituted a changed condition. Indeed, plaintiff anticipated encountering rock and that is why it had a rock cutter available for installation on the dredge. It did contend that the quantity of hard and very hard rock in some sections, and the overall ratio of rock to other materials, greatly exceeded

4. On September 9, 1966, plaintiff formally notified the Area Engineer, Corps of Engineers, it had encountered substantial rock in the borrow area but that the extent of this changed condition was not known at that time. Subsequent letters of November 29, 1966, and December 19, 1966, advised that subsurface changed conditions continued to be encountered but that the full extent thereof could not then be determined. On September 1, 1967, plaintiff made a formal claim for an equitable adjustment due to encountering changed conditions, substantial quantities of rock, during contract performance.

that which it anticipated from its examination of the contract documents and other information available to it in its prebid investigation. While plaintiff contends it maintained records which segregated the materials excavated, such records were not available at any time material herein.[5] Accordingly, plaintiff relied on expert testimony to estimate the percentage of rock it actually encountered in dredging material from the borrow area. These estimates, which exceeded the rock estimate indications in the contract drawings, formed the core of plaintiff's argument to the Board that it encountered substantially greater quantities of rock than it reasonably anticipated from a review of the contract documents.

Plaintiff employed a geologist, Dr. H. Kelly Brooks, to study the borrow area in question. Dr. Brooks was an Assistant Professor of Geology at the University of Florida and also served as a consultant at various times on geological matters. The borrow area was under water at the time of Dr. Brooks' study in March-May 1967 and his study was directed at the banks (east and west) of the canal created by the excavation of the borrow area in question. Dr. Brooks used scuba diving gear and artificial light to examine the bank areas. He tested underwater the east and west bank materials with a special hammer and the responses thereto guided him in classifying the materials inspected. In general, soft materials, as opposed to hard materials, will produce, when hit with such a hammer, either a thud or no sound at all. He also took samples of materials from various locations on the banks and later examined them on the surface for hardness qualities. In this underwater investigation, Dr. Brooks obtained data every 200 feet at each survey station on the east bank and every 400 feet, or at every other survey station on the west bank. From this extensive underwater investigation and analysis, Dr. Brooks prepared a stratigraphic diagram of the borrow area wherein he interpolated the results of his investigation and analysis of the east and west banks of the canal to cover the excavated area separating said banks.[6] In his report on his investigation and analysis Dr. Brooks stated that in general the ratio of material that could be classified as rock to the total volume of material represented at the various locations he surveyed was considerably higher than the ratio indicated by the Government's core borings in the same general area. Specifically, Dr. Brooks found that there was 15.9 percent rock between stations 736 and 564 as compared to 10.5 percent rock indicated in the Government's boring logs (this is roughly equivalent to the first area where plaintiff claimed changed conditions), and 24.5 percent rock between stations 562 and 401 as compared to the 12.8 percent rock indicated in the Government borings (this encompasses generally the second area where changed

---

5. The Board noted that the "Captain's Daily Report," reflecting daily operation of the dredge, which was part of the record, only showed total yardage excavated, with no break down of materials excavated. The Board also noted that defendant's daily logs gave percentages of the character of the materials excavated, but that the monotonously repetitious nature of the daily rock percentage figures set out in these daily reports cast some doubt on the reliability of the same. In these circumstances, concluding that the burden of proof in establishing the quantity of rock rested with plaintiff, the Board held that the defendant's daily logs supported defendant's position that the quantity of rock excavated was not significantly and materially different from that indicated on the Government's boring logs. The Board's conclusions in this regard are supported by the record as well as by the Board's prerogative to assess the weight to be given to the totality of the evidence.

6. Dr. Brooks viewed this extensive underwater investigation and stratigraphic analysis as a unique feat in the field of geology. He defined "stratigraphy" as "[t]he tracing and origin of the different layers of rock and actually it gets to the dates and ages of these materials and the origin." Dr. Brooks also conceded that stratigraphy was not an exact science and that he had to correlate and interpolate in reaching his rock percentage estimates, conceding that his results reflect some artistic imagination and artistic liberty (Tr. 220–21, 232, 273).

conditions were claimed).[7] The Board carefully examined the report of Dr. Brooks.

■ Defendant also conducted investigations relative to the claim of changed conditions. One investigation was made by Government personnel and another by a private firm, Geotechnical Engineering of Lakeland, Florida. This firm submitted a report on its investigation, which, it appears, was also the result of a scuba diving operation. Neither of these investigations, which undoubtedly played a role in the decision reached by the contracting officer, was in the Board record.[8] However, since a matter before the Board is a *de novo* proceeding, Monroe Garment Co. v. United States, 488 F.2d 989, 1001, 203 Ct.Cl. 324, 345 (1973), whether certain materials were before the contracting officer or not is immaterial when determining the substantiality of the Board's determination.

After the contracting officer's decision on August 12, 1968, a section of the borrow area between stations 536 and 470 (this was in the second area of claimed changed conditions) was dewatered down to an elevation of minus 3.3 feet, and representatives of both parties given an opportunity to examine and classify the various strata exposed on the banks of the dewatered area. At various locations in the dewatered area trenches were excavated to remove surface material and to expose undisturbed subsurface material.

■ Dr. Brooks conducted the investigation of the dewatered area on plaintiff's behalf. He did not plot the west bank of the canal because, "the section on the west side are so badly covered even my original data was poor * * *" (Tr. 147). Dr. Brooks spent 11 days in April-May 1969 at the dewatered site where he examined the exposed east bank of the canal at 200-foot intervals. For the area between stations 536 to 470, Brooks testified his study showed there was 27.8 percent rock which he compared to the 9.86 percent rock indicated in the six Government log borings most applicable to the dewatered area. At the request of Dr. Brooks three other geologists also spent a day or two at the dewatered site; and they were in general agreement with Dr. Brooks' findings relative to the strata present in the area, believing Dr. Brooks was more conservative in his rock estimates than they would have been. The record does indicate that these geologists did not always classify the materials as did Dr. Brooks. The Board, and rightly so on this record, gave more attention to Dr. Brooks' testimony than to the testimony of the other three geologists since it was more detailed. *See* Northbridge Electronics v.

---

7. When some inconsistencies were brought to Dr. Brooks' attention between his report and the dredge's production records, he advised plaintiff's President by letter dated August 22, 1968, that his "diagrams record the rock at the sides of the borrow canal. We will never know the exact amount of rock that was actually excavated by the dredge. It may be considerably more or less than that occurring to either side at any one particular station." In short, the inconsistencies were that in some areas where Dr. Brooks estimated various rock percentages of 9.4 percent (section 4), 21.7 percent (section 5) and 16.7 percent (section 8) dredge production was generally the same. These estimates were inconsistent with plaintiff's contention that dredge production was affected by the amount of rock encountered.

8. Dr. Brooks prepared an evaluation of the Geotechnical report but it too was not a part

of the Board record. While plaintiff contends that unfavorable inferences should be drawn from the failure of the Government to introduce the results of these investigations into evidence before the Board or to produce as witnesses individuals associated with said investigation, the record indicates that plaintiff, aware of these investigations, had ample opportunity to make the reports part of the Board record or request or attempt to obtain the presence at the hearing of these individuals (*see* Tr. 277–82). More importantly, under such circumstances, inferences such as plaintiff seeks here, much like the element of credibility, are more properly for the Board to draw, or determine, rather than the court. *See* Chaney & James Constr. Co. v. United States, 421 F.2d 728, 738, 190 Ct.Cl. 699, 717 (1970); *see also* Seger v. United States, 469 F.2d 292, 309, 199 Ct.Cl. 766, 795 (1972).

United States, 195 Ct.Cl. 453, 460–62, 444 F.2d 1124, 1128–29 (1971).

The Board in its opinion set out in chart[9] form a comparison of the data reflected in six Government boring logs applicable to the dewatered area with the results obtained by Dr. Brooks in his 1969 dewatered area investigation. This chart discloses that on average, the material associated with the six core borings was composed of some 12 percent rock.[10] The corresponding rock percentages from Dr. Brooks' study are, on average, 10.5 percent when only rock classified as medium to very hard is considered, and 25.8 percent when "soft rock" is included.

Dr. Robert Vernon, Chief of the Bureau of Geology for the State of Florida, investigated the dewatered area on behalf of defendant. He spent 4 days in April-May 1969 at the dewatered site, surveying the east bank at 200-foot intervals and the west bank at 400-foot intervals. After studying the applicable Government boring logs, and based on his investigation of the dewatered area, Dr. Vernon testified that the boring logs compared favorably with the materials he found during his survey of the dewatered area. In general, he also testified that the total Government boring logs were consistent with the geology of the area. Dr. Vernon estimated there was an average of 12 percent rock in the dewatered area.

The Board found that although Dr. Vernon's report used different descriptive terms in classifying materials than did Dr. Brooks in his report relative to their investigations of the dewatered area, a careful examination of both reports convinced it that there were no major differences between the two geologists, "having in mind that the issue here involved is whether or not the contractor encountered an excessive amount of rock which would not break down into material which could be handled by the 26-inch hydraulic dredge." (Bd. Dec. pp. 11–12).[11] The higher percentage of material classified as rock by Dr. Brooks included, the Board found, material classified by him as "soft rock," whereas Dr. Vernon classified that same "soft rock," as loosely cemented, irregularly case-hardened material. Finding that the conclusions, properly analyzed, of the two geologists were in general agreement, the Board extrapolated these results to cover the entire borrow area in question and concluded that the differences between the parties as to the character of the material encountered was one of terminology rather than substance (Bd. Dec. p. 12).

The basis of plaintiff's claim before the Board was that the quantity of rock

9. A careful examination of the record indicates that the Board's rock percentage figure of 20.5 percent, medium hard, for Core Bore No. 9A, is incorrect and should instead reflect a rock percentage figure of 17.7 percent. This error, however, does not materially impinge on the integrity of the Board's overall analysis or conclusions relative to the comparisons it made.

10. The 12 percent figure is greater than the 9.86 percent figure computed by Dr. Brooks. The difference can be attributed to the fact that the Board in its computations used the total depth of the boring log from the surface to elevation minus 3.3 feet, the depth to which the area was dewatered, which was the same depth used by Dr. Brooks in his 1969 study and computations, and not the original core boring project depth of minus 8 feet. If Dr. Brooks in comparing his 1969 study results with a minus 3.3 feet elevation used the core boring data to the same minus 3.3 feet elevation, he would have presumably arrived at the same approximate percentage the Board did.

11. Plaintiff argues that this characterization of the issue involved by the Board is incorrect, advising that the issue is whether or not the conditions encountered were materially different from those indicated on defendant's boring logs. On this record, it would appear plaintiff is engaging in semantics. In its phraseology, the Board was simply giving due regard to the reasonable conclusion that only rock which caused plaintiff difficulties should be considered in determining the validity of the changed condition claim. Hence, if "soft rock" or loosely cemented materials posed no problems, it should not be considered as changed condition material. In any event, the phraseology used by the Board has no effect on the ultimate conclusions reached by the Board.

it encountered in the borrow area greatly exceeded that which it anticipated from an examination of the contract documents and other information available to it during the prebid investigation period. In support of its claim plaintiff advanced before the Board the following contentions: (1) Estimated productivity of the dredge was decreased in sections 4, 5, 7, 8, and 9 of the borrow area causing work to continue for 97 additional days more than the 240 estimated scheduled workdays. This entire delay period is attributed by plaintiff to the encountering of excessive quantities of rock, viewed as changed conditions, which hampered daily production; (2) The presence of excessive rock was manifested by the unusual wear and tear on the dredge equipment, especially the unusually high replacement of rock cutter teeth and main pump runners and liners; and (3) The testimony and reports of expert geologists, especially Dr. Brooks, support the asserted changed conditions claim.

The Board, after careful consideration of the record evidence, found "that the core boring logs contained in the contract documents fairly represented the conditions logged by Dr. Brooks and Dr. Vernon relative to their dewatered area study. We also consider that Dr. Brooks' investigation and report [obviously referring to the 1967 underwater investigation] do not support a finding that conditions actually encountered were materially different from those indicated in the contract documents" (Bd. Dec. pp. 15–16). Further, the Board stated that, "we cannot find that the alleged excessive replacement of wearing parts on the dredge or the extended performance time are conclusive evidence of a changed condition due to the lack of proof as to the amount of wearing parts replacement normal to work of the char-

acter involved and a performance time related to the actual volume of material dredged during performance of the contract work absent the alleged changed condition." Plaintiff takes issue with several determinations made by the Board relative to its final decision, and these challenges are treated below.

## II.

▮▮ As indicated previously, it is clear that we are concerned with a category 1 changed conditions claim. Plaintiff contends that an issue of law is involved, in some manner, in the Board's decision and the court has no finality restrictions in interpreting what the contract indications are relative to a category 1 changed conditions claim. McKee v. United States, 500 F.2d 525, 205 Ct.Cl. 303 (1974). It is clear beyond cavil that interpretation of contract documents is a judicial function to be performed independently of any Board decision. Foster Constr. C. A. v. United States, 435 F.2d 873, 880, 193 Ct.Cl. 587, 601 (1970). However, this established proposition is not for application herein because the dispute in this case does not center on what was indicated by the contract document [12] but what conditions were actually encountered by plaintiff during contract performance. This latter determination is purely factual in nature [13] and resolution by the Board of factual disputes is entitled to finality where supported by substantial evidence and not otherwise arbitrary. Dale Ingram, Inc. v. United States, 475 F.2d 1177, 1184, 201 Ct.Cl. 56, 69 (1973); Ivy H. Smith Co. v. United States, 154 Ct.Cl. 74, 82–83 (1961). Under these circumstances, even though the court may well disagree with the Board's decision and might decide the question differently if faced with it as an original matter, unless plaintiff

12. Indeed, there is general agreement as to what the contract indications were. They indicated the presence of rock in varying degrees in sections 4 through 9 of the borrow area, and rock was encountered during contract performance. The question is whether materially greater quantities of rock, substantially in ex-

cess of amounts indicated in the contract documents, were encountered.

13. Lenry, Inc. v. United States, 297 F.2d 550, 551, 156 Ct.Cl. 46, 49 (1962); Henry E. Wile Co. v. United States, 169 F.Supp. 249, 144 Ct.Cl. 394, 399 (1959).

can establish that the Board's decision suffers from Wunderlich Act disabilities, it cannot recover. H. N. Bailey & Associates v. United States, 449 F.2d 376, 387, 196 Ct.Cl. 166, 185 (1971). Too, a plaintiff who seeks to set aside the factual determinations of a Board carries a heavy burden. Donald M. Drake Co. v. United States, 439 F.2d 169, 171, 194 Ct.Cl. 549, 553 (1971).

In determining whether or not the actual quantities of rock encountered during performance were excessive in relation to the amounts of rock one could reasonably anticipate from a study of the contract boring logs, the Board did not have the benefit of data reflecting what percentage of the material excavated actually consisted of rock. What it did have were estimates of the percentages of rock which geologists believed probably existed in the area excavated based on their survey station examinations of the banks of the excavated area and subsequent interpolation of the data which they believed comprised the banks.[14] Faced with this situation, the Board had to resolve and/or reconcile the conflicting reports of qualified geologists in order to reach a factual determination of what the subsurface conditions actually were in the excavated borrow area. This determination involved, to some degree, reliance by the Board on its expertise in technical matters. H. N. Bailey & Associates v. United States, *supra,* 449 F.2d at 386, 196 Ct.Cl. at 184, and certainly involved an assessment of the credibility of the witnesses and the probative value of their testimony. Seger v. United States, 469 F.2d 292, 309, 199 Ct.Cl. 766, 795 (1972). In these areas, the Board, as the trier of

facts, will be presumed to have acted properly and correctly. Chaney & James Constr. Co. v. United States, 421 F.2d 728, 740, 190 Ct.Cl. 699, 720–21 (1970). These presumptions can be rebutted but it is plaintiff's burden to do so.

■ Plaintiff first argues that the Board erred in giving any consideration to Dr. Vernon's report and rock estimates, based on his 1969 investigation of the dewatered area of the excavation canal, in determining whether or not plaintiff encountered excessive rock in the borrow area. Plaintiff contends that Dr. Vernon's report only covered the dewatered area (stations 536 to 470), which was only a portion of the second area (stations 540 to 401 + 50) where changed conditions were alleged to have been encountered, and did not cover the first area (stations 746 + 50 to 568 + 50) of alleged changed conditions at all. Since the only evidence in the record covering the entire borrow are was the report by Dr. Brooks based on his underwater study of the banks of the excavated canal in 1967 and his graph and profile comparison of his rock estimates based on said study with the Government's core boring log rock estimates, plaintiff argues the Board was compelled to accept this evidence as submitted without question. The Board, however, was not persuaded by Dr. Brooks' 1967 underwater survey results (Bd. Dec. p. 16), and "[e]ven uncontradicted opinion testimony is not conclusive if it is intrinsically nonpersuasive." Sternberger v. United States, 401 F.2d 1012, 1016–17, 185 Ct.Cl. 528, 535–36 (1968); *see also* Northbridge Electronics, Inc. v. United States, *supra,* 444 F.2d at 1129, 195 Ct.Cl. at 462 (1971).[15] Indeed, the court,

14. The boring logs of the Government and the plaintiff clearly showed the discontinuous nature of the subsurface strata which was subject to material variations within relatively short distances. *Cf.* Farnsworth & Chambers Co. v. United States, 346 F.2d 577, 580, 171 Ct.Cl. 30, 34 (1965). Thus the projections of the geologists were clearly of a kind that were not absolute. Indeed, Dr. Brooks, as noted above, advised that one would "never know the exact amount of rock that was actually

excavated." Dr. Brooks also conceded that it was possible to have a rock shelf along the bank and there may not be any corresponding rock shelf in the area that was excavated (Tr. 179).

15. This underwater study and resulting stratigraphic profiles and diagrams were admitted to be a novel and unique geological first by Dr. Brooks. Indeed, he knew of no reputable geologist who performed this type of survey.

when faced with a somewhat similar attack on a Board decision in a situation involving opposing geologists refused to say that the Board was compelled to disregard one geologist's opinion because, *inter alia,* he only inspected one-half of a tunnel. Carlo Bianchi & Co. v. United States, 167 Ct.Cl. 364, 376 (1964), cert. denied, 382 U.S. 841, 86 S.Ct. 32, 15 L.Ed.2d 82 (1965).

In the dewatered area, both Dr. Brooks and Dr. Vernon made investigations unhindered by water and resulting visibility restraints. As noted previously, the Board concluded that Dr. Vernon's report was in substantial agreement with Dr. Brooks' report relative to the results, properly analyzed, each obtained from an investigation of the dewatered area. Once this was determined, the Board extrapolated these results to cover the entire borrow area in issue [16] and concluded that the difference between the two experts was one of terminology (*i. e.,* descriptive terms used to classify materials) rather than substance (Bd. Dec. p. 12). An examination of these reports and a careful review of the total record discloses that the Board's conclusion was a reasonable one to draw therefrom. Indeed, on the briefs before the court, plaintiff has not made a convincing case which would indicate that the Board's conclusion was improper or not supported by substantial evidence.

Accordingly, it has failed to meet its heavy burden in this regard and the Board's conclusion of fact must stand. Teitelbaum v. United States, 458 F.2d 72, 78–79, 198 Ct.Cl. 150, 161–63 (1972).[17]

Plaintiff vigorously maintains that vital differences existed in the reports of Dr. Brooks and Dr. Vernon. Plaintiff's comparison chart, directed at the two reports, does reveal differences between them, even when "soft rock" is excluded from Dr. Brooks' total rock figures. In some instances, Dr. Vernon's rock measurements at a given point exceed those recorded by Dr. Brooks. For example, at station 484, Dr. Brooks found 14.4 percent rock on the east bank that he classified as medium to very hard, whereas Dr. Vernon found some 25.88 percent rock in this area. At station 486, the corresponding rock figures were 13.5 percent for Dr. Brooks and 25.74 percent for Dr. Vernon. At other stations, the situation was reversed with Dr. Brooks finding more rock than Dr. Vernon.[18] On the basis of this comparison chart alone, the court is unable to conclude that the Board's treatment of the experts' testimony and documentary evidence on the basis of the total record is lacking or devoid of vitality, *cf.* Wm. A. Smith Contracting Co. v. United States, 188 Ct.Cl. 1062, 1073, 412 F.2d 1325, 1330–31 (1969).

There was testimony in the record by Dr. Vernon that one could easily conclude while working underwater there was more rock present than was actually the case. In the dewatered area, he discovered no rock where Dr. Brooks, based on his underwater study, indicated rock (Tr. 684–99). Visibility and overlay material also presumably hampered such work. Under these circumstances, the Board reasonably could be unpersuaded by this type of study. *See* H. N. Bailey & Associates v. United States, *supra,* 449 F.2d at 387, 196 Ct.Cl. at 185.

16. The Board's resort to extrapolation to cover the entire area was reasonable under the circumstances. It is noted that Dr. Brooks in his study interpolated data from surveyed areas to cover areas not surveyed or investigated. He defended this technique in view of the large area involved (Tr. 206, 219–20, 232). The

Board cannot be faulted for employing a similar technique.

17. Plaintiff, in its briefs, details various pieces of evidence before the Board and, in effect, asks the court to reweigh this evidence and overturn the Board's factual conclusions drawn from the record as a whole. In cases of this type, the court cannot reweigh the evidence independently. Chaney & James Constr. Co. v. United States, *supra,* 421 F.2d at 742, 190 Ct.Cl. at 724.

18. For example, Dr. Brooks measured 16.6 percent rock at station 520, whereas Dr. Vernon measured 3.5 percent rock; at station 518, Dr. Brooks measured 16.6 percent rock whereas Dr. Vernon measured 1.12 percent rock. At station 516, Dr. Brooks recorded 21.8 percent rock and Dr. Vernon reported 4.18 percent rock.

Plaintiff maintains that the Board erred in excluding "soft rock" and certain "rock" of a borderline nature which would have no appreciable effect on the dredging operation (Bd. Dec. pp. 12 and 17). The record in this case indicates that there is no universally accepted definition of rock. The record also indicates that geologists differ in the language they use to classify materials. The Board noted that Dr. Vernon classified "material as being loosely cemented, irregularly case hardened" whereas Dr. Brooks' classification of the same material would describe "several layers as sand and shell, semiconsolidated with some soft rock" (Bd. Dec. p. 12).[19] Under these circumstances, the Board carefully examined the record before it and noted those areas (stations 924 + 30 and 746 + 50) where plaintiff did not claim changed conditions, ostensibly because it had no difficulty in excavating the materials, and also noted the penetration blows per foot data reflected in the six Government boring logs pertinent to this area indicating the hardness of the subsurface materials, before concluding "that partially cemented materials requiring less than 25 blows per foot for penetration, which could be classified as 'soft rock' are not a factor in this claim,"[20] since "soft rock did not cause difficulty in the dredging process and was not considered to be a changed condition" (Bd. Dec. p. 15). Thus the Board established a reasonable basis on which to gauge the hardness of materials described in the various reports for purposes of trying to estimate whether excessive rock was encountered. As a result, it is difficult to appreciate plaintiff's assertion in its brief that there is

absolutely no reference to any portion of the record justifying the Board conclusions in this regard. On this record, the Board's approach to resolution of the rather nebulous problem before it must be accepted. The Board's statement, justifying this approach, that, "[t]his point [the exclusion of "soft rock"] is further bolstered by the fact that there is no direct analogy between the percentage of rock found in the various sections of the borrow area as originally broken down by the appellant and the actual dredge production when operating within the sections," (Bd. Dec. p. 15), while unchallenged, is brushed aside as irrelevant by plaintiff. But it is relevant in explaining why the Board, deprived of data reflecting actual amounts of rock excavated and burdened with expert reports which classified materials differently, established a reasoned and fair method to try and determine whether excessive difficulty-causing rock was actually encountered by plaintiff. Plaintiff fails in its burden to establish error on the part of the Board in excluding "soft rock" from Dr. Brooks' figures. Sundstrand Turbo v. United States, 389 F.2d 406, 422–23, 182 Ct.Cl. 31, 60 (1968). It is not the court's function to make an independent excursion into the administrative record to remedy this failure. See Jefferson Constr. Co. v. United States, 368 F.2d 247, 252, 177 Ct.Cl. 581, 589 (1966). Furthermore, even when the record is closely examined, one cannot say that the Board's analysis and conclusion were arbitrary or not supported by substantial evidence. Once again, the conclusion reached by the Board relative to exclusion of "soft rock" as a claim factor is the product of judgment and

**19.** Even the other geologists who testified on plaintiff's behalf classified some materials differently than did Dr. Brooks (Tr. 318–23, 368–73, 397–98). It would appear that Dr. Brooks recorded as rock what others considered cemented or hardened sand and shell (see Tr. 130, 236–38, 274; Tr. 318–24; Tr. 397–98; cf. Tr. 480, 499, 503–04, 563; Tr. 660–85, 691–99).

**20.** Wilkerson, plaintiff's Florida District Manager, supported the Board in this regard, when he stated he thought the classification of rock

would begin anywhere from 25 blows per foot and up, but hastened to add "that doesn't means that you can't run into material that won't get a blow count like hard-packed sand and if you don't know what you are in, it will drive just as hard as a softer grade of rock." (Tr. 107) Both the Government's prebid borings and the plaintiff's prebid borings classified rock by blows per foot and were comparable (see Bd. Dec. p. 14; Tr. 104–07, Tr. 497–500).

expertise and without overriding evidence to the contrary the court is precluded from exercising its own independent judgment in order to reach a contrary conclusion. Carlo Bianchi & Co. v. United States, *supra,* 167 Ct.Cl. at 368.[21]

Plaintiff next argues that the Board completely disregards all testimonial evidence concerning the unusually high replacement of dredge cutting equipment as an indication of the occurrence of changed conditions. The truth is the Board did not disregard this evidence, but, in considering it, found such evidence to be of little or no probative value because there was a lack of evidence in the record as to the amount of wear and replacement normally to be expected when dredging materials undisputedly shown in the contract documents. The weight the Board gives the evidence is one of its prerogatives and unless clearly shown to be erroneous, the court will not disturb its conclusion drawn therefrom. Chaney & James Constr. Co. v. United States, *supra,* 421 F.2d at 742, 190 Ct.Cl. at 724. Lacking evidence of what was normal replacement, the Board could hardly decide what was abnormal or excessive replacement. Moreover, plaintiff proffered no evidence as to the classification of material which actually went through the dredge, evidence which might have had some bearing on whether, in fact, excessive rock quantities were the cause of such alleged excessive wear and replacement. The only records that were available, containing the only information in

this regard, were the Government's daily logs, and the Board found, and plaintiff has not adequately challenged the finding herein, these logs and their material classifications supportive of a conclusion that no changed conditions were encountered.

In its brief, plaintiff seeks to provide evidence of what could normally be expected with respect to replacing equipment. Before the Board, plaintiff produced a chart entitled "Tabulation of Replacement Due To Abrasive Wear." Plaintiff, utilizing this chart, points to the period November 12, 1966–November 24, 1966 (encompassing dredge work between stations 568 + 50 and 540 + 75). No changed condition, because no difficulty was encountered in working this area, was claimed here although Dr. Brooks estimated 16.7 percent rock for this area and the Government's boring log (station 550) indicated that approximately 13.3 percent of the material in the area would be rock. Plaintiff contends that replacements which were made while working this nonchanged conditions area with 13.3 percent of the material considered rock, can be viewed as normal replacements and thus provides the necessary comparison tool for determining what is excessive. Analysis of the Tabulation Chart and the other evidence of record does not support plaintiff's contention.[22] For example, during the entire month of September 1966, when plaintiff was working in an area where it claims changed conditions, only 128 new cutter teeth were needed

---

21. While not determinative herein, it bears remembering that plaintiff made its own borings, and presumably inflated its bid costs to cover such expense, indicating it did not rely completely on the Government's boring logs. See in this regard Foster Constr. C.A. v. United States, 435 F.2d 873, 887, 193 Ct.Cl. 587, 613–14 (1970). We need not decide if this action by plaintiff constituted a significant indication of nonreliance on the contract indications such as to defeat a category 1 changed conditions claim. *See* Perini Corp. v. United States, 381 F.2d 403, 409–12, 415, 180 Ct.Cl. 768, 778–82, 788 (1967); *see also* T. F. Scholes, Inc. v. United States, 357 F.2d 963, 969–70, 174 Ct.Cl. 1215, 1225–26 (1966).

22. Plaintiff also complains because the Board was not persuaded by the testimony of Wilkerson relative to wear and replacement. However, aside from the Board's right to judge the probative value of testimonial evidence, the testimony of Wilkerson was far from enlightening on wear and replacement and what was normal replacement. His testimony did indicate that sand alone has a wearing effect when going through the dredge (*see* Tr. 89–98), and the record indicates that replacement of parts took place during periods when no changed conditions were alleged to have been encountered.

whereas during the period November 12–24, 1966, while working in an area where no changed conditions are alleged, and which plaintiff considers a normal work area, some 223 cutter teeth were replaced. This certainly casts serious doubt on the validity of plaintiff's contention based on replacement data. The Board's conclusion in this regard must be accepted.

Finally, plaintiff takes issue with the Board's refusal to find the extended performance time by itself was proof of encountering changed conditions (Bd. Dec. p. 18). The Board observed that there may be a number of explanations why the estimated performance time was exceeded.[23] As an example, the Board cited the fact that a simple overrun in the material dredged could be viewed as accounting for 15 days of the 97 days which plaintiff claimed resulted solely from the changed condition.[24] Plaintiff presents nothing by way of record citation, or otherwise, which establishes that the Board's conclusion relative to rejection of extended performance time as proof of changed conditions is in any way erroneous. As indicated earlier, it is plaintiff's burden to show that the record before the Board does not support it findings and conclusions. Sundstrand Turbo v. United States, *supra,* 389 F.2d at 422–23, 182 Ct.Cl. at 60.

To be successful on a category 1 changed conditions claim, the actual conditions encountered must differ materially from those indicated on the contract documents or reasonably to be expected from an examination thereof. Here, plaintiff contends the actual conditions were that plaintiff encountered significantly greater amounts of rock from what it reasonably anticipated or had a right to expect. The Board, on the

record before it, could not make the necessary factual findings which would support such a contention, and thus plaintiff's claim must fail since the Board's decision is reasonable and supported by substantial evidence. J. A. Terteling & Sons v. United States, 390 F.2d 926, 931–32, 182 Ct.Cl. 691, 700–02 (1968).

## CONCLUSION

In light of the foregoing, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and plaintiff's petition is dismissed.

---

23. It is to be remembered that the dredge used was a new one. There is some evidence in the record that production may have been affected by the operational condition of the dredge (*see* Tr. 785, 814–16, 825, 844–53). Too, plaintiff's production estimates were based primarily on the operations of a tried and tested dredge, the "Admiral."

24. Plaintiff does not contest this observation by the Board. Instead, it adopts it as the basis for an alternative claim utilizing 82 days as the extended period which resulted from the alleged changed conditions.