UMPQUA RIVER NAVIGATION COMPANY, Appellant,

v.

CRESCENT CITY HARBOR DISTRICT, Appellee.

UMPQUA RIVER NAVIGATION COMPANY, Cross-Appellee,

v.

CRESCENT CITY HARBOR DISTRICT, Cross-Appellant.

Nos. 77–4000, 77–4046.

United States Court of Appeals, Ninth Circuit.

May 12, 1980.

David M. Buoncristiani, San Francisco, Cal., Daniel J. Seifer, Kobin & Meyer, Portland, Or., argued for Umpqua River Navigation; Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., Norman B. Kobin, Portland, Or., on brief.

David M. Van Hoesen, Eric Danoff, Graham & James, San Francisco, Cal., argued for Crescent City Harbor Dist.; Thomas M. Dillon, Williams, Van Hoesen & Brigham, San Francisco, Cal., on brief.

Before CHOY and GOODWIN, Circuit Judges, and SOLOMON,* District Judge.

GOODWIN, Circuit Judge:

Umpqua River Navigation Company (Umpqua), a general contractor, appeals a judgment denying recovery of cost overruns incurred by its subcontractor, Western Pacific Dredging Corporation (Western), while dredging a boat basin for Crescent City harbor district. Umpqua alleged, under various contract and tort theories, that specifications provided by the harbor district and prepared by Swinc Engineering, Inc. inaccurately represented soil conditions in the dredging area, that Umpqua and Western relied on these specifications in submitting contract bids, and that, during the dredging, Western encountered conditions materially differing from those shown in the specifications, resulting in unforeseen costs. The harbor district filed a third-party complaint against Swinc, alleging that if the specifications were negligently prepared, Swinc must indemnify the harbor district. The district court found that Umpqua could not recover under any theory and entered judgment for the harbor district and Swinc against Umpqua, and for Swinc on the harbor district's indemnity action. We affirm.

* The Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation.

The series of events underlying this litigation began in the early 1970's, when the harbor district decided to investigate the possibility of expanding its boat facilities. In June 1971, as part of its preliminary research, the harbor district commissioned an independent firm, AAA Drilling, to drill eight test holes on the beach near the site of the proposed new boat basin to find bedrock levels. AAA subsequently prepared drawings, showing the location of its borings, the depth of bedrock, and the materials found between the surface and bedrock. AAA made no underwater borings in the proposed dredging channel.

Shortly after these drillings, still in June 1971, the harbor district informed Swinc that it had been chosen to design the new boat basin. The harbor district turned the AAA results over to Swinc, and, after prolonged negotiations, the harbor district and Swinc signed a formal agreement in May 1972.

In August 1972, Swinc arranged for Harding, Miller, a soils engineering firm, to make two more test borings. These holes were drilled in the area where the breakwater surrounding the boat basin was to be constructed, not in the dredging channel.

The results of the AAA and Harding, Miller borings were included in sheet 002 of the boat basin plans. Sheet 002 showed the presence of sandy clay, sand, clay, and gravel at the test hold sites. The term "gravel" was not defined in the plans, and nothing in the contract materials furnished to bidders interpreted or elaborated on this soil information.

In March 1973, the harbor district invited sealed bids on the boat basin construction. The bidding materials included plans, specifications, and special and general conditions. Particularly relevant to this case are special conditions 3 ("Examination of Site") and 4 ("Soil Information and Pile Tests"), and general condition 21 ("Subsurface Conditions Found Different").[1] Contractors were given thirty days to submit their bids.

Before bidding, Umpqua examined the results of the AAA borings reported on sheet 002 and concluded that they were unreliable except as showing the depth of bedrock. Umpqua's project engineer found the test results defective because the soil logs were inconsistent and because the logs did not include a legend defining various soil terms. Umpqua did, in compliance with special condition 4, request the reports underlying the Harding, Miller soil logs. Those borings, however, were taken at the location of the proposed breakwater, and not in the dredging channel.

1. Special Conditions 3 and 4, and general condition 21 read as follows:

"3. *EXAMINATION OF SITE*
"Each bidder shall thoroughly examine and be familiar with the site of the proposed project and submission of a Proposal shall constitute an acknowledgment upon which the Owner may rely that the bidder has thoroughly examined and is familiar with the site. The failure or neglect of the bidder to fully familiarize himself with the conditions at the project site shall in no way relieve him from or to the Contract. No claim for additional compensation will be allowed which is based upon lack of knowledge of the site.
"4. *SOIL INFORMATION AND PILE TESTS*
"The drawings show soil test logs and pile test logs reproduced from reports by the District's Soil Consultant. Copies of these reports are on file at the offices of the Engineers and at the District Office and may be examined by prospective bidders. Each bidder shall make his own evaluation of the information contained in the reports. Neither the Owner or the Engineers guarantee that the soils borings, pile test logs or other information shown are typical for the entire site of the work."
"21. *SUBSURFACE CONDITIONS FOUND DIFFERENT*
"Should the Contractor encounter subsurface and/or latent conditions at the site materially differing from those shown on the Plans or indicated in the Specifications, he shall immediately give notice to the Architect/Engineer of such conditions before they are disturbed. The Architect/Engineer will thereupon promptly investigate the conditions, and if he finds that they materially differ from those shown on the Plans or indicated in the Specifications, he will at once make such changes in the Plan and/or Specifications as he may find necessary, and any increase or decrease of costs resulting from such changes to be adjusted in the manner provided in Paragraph 17 of the General Conditions."

Western Pacific also conducted a pre-bid investigation. Robert Kaltsukis, a Western Pacific dredge captain, visited the project site. Kaltsukis, who had encountered rocks while dredging a nearby portion of Crescent City harbor in the mid 1960's saw submerged rocks in an area adjacent to the dredging site. As part of his on-site inspection, Kaltsukis used a backhoe to dig test holes near two of the AAA boring locations. The results of these tests, which did not get down to project level, were inconsistent with the information shown on sheet 002, yielding sand and pea gravel, rather than only gravel, as indicated in the AAA results. Despite these discrepancies, Western Pacific did not comply with special condition 4 and attempt to obtain the source data for sheet 002.

Umpqua was awarded the boat basin construction contract in May 1973, and shortly thereafter selected Western Pacific as its dredging subcontractor. Western's subcontract bid, which Umpqua accepted, was based on an estimated dredging output of 10,000 cubic yards per day, using hydraulic dredging methods.

Western began dredging on May 29, 1973. Almost immediately, the dredge "Polhemus" encountered cobbles, boulders, and cemented sand. The dredge sustained damage requiring extensive repairs. These difficulties arose during the dredging of the boat basin's access channel and turning area, areas in which no soil borings were taken. On July 26, Western notified Umpqua that it had encountered conditions materially different from those indicated in the plans and that it was withdrawing the "Polhemus" from the project. Umpqua forwarded this notice to Swinc which, in turn, informed the harbor district.

Western brought in a second, larger dredge, the "Herb Anderson", which encountered difficulties similar to those encountered by "Polhemus." The parties offer conflicting explanations of these problems. Umpqua contends that the damage to the dredges was unprecedented, resulting from extreme and unforeseeable concentrations of cobbles and boulders. The harbor

district and Swinc assert that Western's dredging troubles were due to inefficient crews and improper maintenance of the dredges.

Whatever the source of its dredging problems, Western Pacific, on August 25, again notified Swinc that it had encountered conditions different from those shown in the plans. Swinc and the harbor district did not formally investigate Western's claims until November 28. On that day, with representatives of Western, Umpqua, Swinc, and the harbor district present, Umpqua's floating crane, "Mink", dug test holes at three locations designated by Western. On the basis of these borings, which yielded a large quantity of sand and silt, some cobbles, and one boulder, Umpqua and Swinc engineers decided the basin was dredgable and directed Western Pacific to continue.

Western Pacific completed dredging on December 21. Over six months of intermittent dredging, Western rarely met its projected output of 10,000 cubic yards per day. The material dredged during the entire project was 80 percent sand, 15 percent gravel less than three inches in diameter, and 5 percent material exceeding three inches in diameter. Neither Umpqua nor Western Pacific obtained a change order, as required by general condition 21, or submitted a bill for extra costs at any time before June 6, 1974, when Umpqua reported that the boat basin project was completed.

On June 11, 1974, Western informed Umpqua that it had incurred additional dredging expenses of $523,402. This claim was ultimately forwarded to the harbor district, which formally denied the claim on July 30, 1974. The harbor district then paid Umpqua 75 cents per cubic yard dredged, and Umpqua paid Western 65 cents per cubic yard.

Umpqua and Western agreed, on January 28, 1975, that an action to recover the additional dredging expenses would be brought in Umpqua's name, that Western would select counsel and bear all costs incurred in prosecuting the action, that Western would receive any recovery, and that Western exonerated Umpqua of all liability for the

dredging overruns. Umpqua filed this action the following day.

Umpqua argues in this appeal that it is entitled to recover the dredging cost overruns on Western's behalf under any of four theories. First, the harbor district is required to compensate for the overruns under the contractual "changed conditions" clause. Second, the harbor district is similarly liable for breach of an implied warranty of accuracy of the project's plans and specifications. Third, even if Western's reliance on the project plans for dredging information was unreasonable, Umpqua may, under a comparative negligence formulation, recover some portion of the resultant overruns from the harbor district and Swinc because those parties were negligent in their preparation and presentation of the plans. Finally, Western, as a third-party beneficiary of the harbor district-Swinc contract may recover for damages resulting from Swinc's preparation of inaccurate plans and specifications, breaching that contract.

Before considering these contentions, we must first address appellees' claim that under the *Severin* doctrine Umpqua lacks standing to raise the claims on Western's behalf. *Severin v. United States*, 99 Ct.Cl. 435 (1943), *cert. denied*, 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1974). The Court of Claims has summarized the *Severin* doctrine in the following manner:

> "[A] prime contractor may sue the Government for damages incurred by one of its subcontractors through the fault of the Government . . . only when the

prime contractor has reimbursed its subcontractor for the latter's damages or remains liable for such reimbursement in the future. . . ." *J. L. Simmons Co. v. United States*, 304 F.2d 886, 888, 158 Ct.Cl. 393 (1962).

The harbor district and Swinc argue that Umpqua does not have standing because it is insulated from liability to Western for the overruns in two ways. First, Article 19 of the Umpqua-Western subcontract purports to limit Umpqua's liability, even if unexpected conditions were encountered, to the first subcontract price.[2] Second, even if Article 19 did not limit Umpqua's liability to the subcontract price, the January 28, 1975, agreement between Umpqua and Western, in which Umpqua agreed to bring this action in return for exoneration of any liability for the overruns, absolved Umpqua from liability to its subcontractor before the action was filed.

We note initially that the *Severin* doctrine is based on concepts of sovereign immunity and privity and concerns only standing to raise contractual claims against governmental entities. Nothing in *Severin* or its progeny limits Umpqua's ability to assert noncontractual claims against the harbor district or claims of any sort against Swinc, a private concern. Our inquiry, then, is limited by determining Umpqua's standing to raise claims against the harbor district for breach of warranty or for adjustment under the changed conditions clause.

■ Under the *Severin* doctrine, Umpqua does not have standing to assert a breach of

---

2. Article 19 of the Umpqua-Western subcontract, titled "Final Payment", reads in relevant part as follows:

. . . . .

"In consideration of the promises, covenants and agreements of the Subcontractor herein contained and the full, faithful and prompt performance of this agreement and the plans and specifications constituting a part thereof, the Contractor agrees to pay to Subcontractor and Subcontractor agrees to receive and accept as full compensation for doing all work and furnishing all materials, supplies, etc., contemplated and embraced in this agreement, also for all loss or damage arising out of the nature of the work aforesaid, or

from the action of the elements, or from any unforeseen difficulties or obstructions which may arise or be encountered in the prosecution of the work until its acceptance by the Principal, and for all risks of every description connected with the work; also for all expenses incurred by or in consequence of the suspension or discontinuance of the work, and for well and faithfully completing the work and the whole thereof, in the manner and according to the terms of this agreement and the requirements of the Contractor and the instructions of the engineers in charge of said work, payment at the unit prices contained in Article XX hereof."

warranty claim on Western's behalf. The exculpatory language of subcontract Article 19 thoroughly insulates Umpqua from any liability to Western for breach of warranty. Consequently, Umpqua may not raise a parallel claim against the District.

■ Umpqua may, however, assert Western's derivative claims under the general contract's changed conditions clause. Exculpatory language like that in Article 19 does not trigger the *Severin* bar when "subcontractor claims are asserted as an equitable adjustment under the provisions of a prime contract with the Government" and when the prime contract's equitable adjustment mechanism is incorporated by reference in the subcontract. *Seger v. United States*, 469 F.2d 292, 300, 199 Ct.Cl. 766 (1972). Here, the subcontract incorporated the general contract's changed conditions provision, and the subcontract's exculpatory provisions did not limit resort to that equitable remedy. Because Umpqua is potentially liable under the equitable mechanism, it may, consistent with *Severin*, raise a parallel equitable claim against the harbor district.

■ Appellees' contention that the January 1975 agreement between Umpqua and Western deprives Umpqua of standing to raise the changed conditions claim lacks merit. The agreement was contingent, not fixed. Umpqua was exonerated only if it filed the action. This is not the sort of explicit and unequivocal exculpatory provision sufficient to invoke *Severin*. *See J. L. Simmons Co. v. United States, supra*, 304 F.2d at 892.

■ Umpqua's principal contention is that the harbor district is liable for the dredging overruns under the prime contract's changed conditions provision, general condition 21,[3] because the materials encountered during dredging differed significantly from those shown on sheet 002 of the plans. To prevail on this claim, Umpqua must demonstrate that: (1) the contract plans indicated the presence of certain conditions; (2) this representation differed materially from conditions actually encountered; and (3) Western reasonably relied on these indications to its detriment. *See Foster Construction C. A. & Williams Bros. Co. v. United States*, 435 F.2d 873, 193 Ct.Cl. 587 (1970).

■ We need not determine whether the first two changed conditions criteria were met because the third was not satisfied. Even if the information on sheet 002 indicated soil conditions in the boat basin's access channel and turning area, where dredging was most difficult, which differed materially from those actually encountered, any reliance on the contractual data for dredging information was unreasonable. The district court entered a factual finding that Western's reliance, if any, on sheet 002 was unreasonable, and we are unpersuaded that that finding was "clearly erroneous." Fed. R.Civ.P. 52(a).

The rationale for the changed conditions clause was summarized in *Foster Construction C. A. & Williams Bros. Co. v. United States, supra*. Normally, bidders will engage in extensive pre-bid inspections of project sites to avoid losses from unknown subsurface conditions. For the same reasons, contractors will build a risk contingency element into bids, inflating contract prices. If, however, the government conducts a pre-bid inspection, assuming the burden of investigation, and, through a changed conditions clause, guarantees that the contractor will be compensated for overruns resulting from conditions not detected by the government's logs, then the inflationary cushion in bidding should be reduced. *Id.* at 887.

■ Consistent with these purposes, provisions in contracts including changed conditions clauses which shift some of the burden of investigation to the bidder are narrowly construed and government disclaimers of responsibility for contractual indications are disregarded. *See Foster Construction*, 435 F.2d at 887–888; *United Contractors v. United States*, 368 F.2d 585, 177 Ct.Cl. 151 (1966). Accordingly, we give the

**3.** *See* note 1 *supra*.

exculpatory language in the harbor district-Umpqua contract, special conditions 3 and 4[4], no effect.

■ Still, bidders are required to inspect documents brought to their attention in the bidding materials and to make a general inspection of the project site:

> "[A] contractor cannot call himself misled unless he has consulted the relevant Government information to which he is directed by the contract, specifications, and invitations to bid. As we read them, the decisions of the Supreme Court and of this court do not permit the contractor to rest content with the materials physically furnished to him; he must also refer to other materials which are available and about which he is told by the contract documents." *Flippin Materials Co. v. United States*, 312 F.2d 408, 414, 160 Ct.Cl. 357 (1963) [footnote omitted].

*Flippin* was a misrepresentation case, but the same duty to consult cross-referenced material is implicit in the "reasonable reliance" language of cases involving changed conditions claims. *See, e. g., Foster Construction*, 435 F.2d at 888 ("The contractor is unable to rely on contract indications of the subsurface only where relatively simple inquiries might have revealed contrary conditions); *United Contractors*, 368 F.2d at 596 ("Business sense and human nature would tell contractors not to shut their eyes to relevant data of this type.").

Here, special condition 4 informed bidders that the backup reports for the soil data shown on sheet 002 were available at the harbor district's office. Western Pacific made no effort to obtain this information. Robert Lofgren, Western's president, testified that if he had seen the backup data, Western would have pursued a different sort of on-site inspection than it did. Western's failure to seek the backup information undercuts its claim of reasonable reliance.

Several other factors further counter Western's position. Western's dredge captain, Robert Kaltsukis, had encountered rocks on previous occasions while dredging areas of the harbor near the project site. *Cf. Morrison-Knudson Co. v. United States*, 345 F.2d 535, 540, 170 Ct.Cl. 757 (1965) (emphasizing contractor's prior experience with similar conditions in the same locale). Other Western personnel noticed partially submerged boulders in an area adjacent to the dredging channel during their on-site inspection. The presence of boulders adjacent to the project area reasonably should have alerted Western to the possibility of boulders in the dredging channel.

Finally, although the changed conditions clause rationale may have released Western from any obligation to do investigatory digging at the project site, Western did in fact dig some test holes. The fact that Western made its own borings indicates that it was not completely relying on the harbor district's boring results. *See Arundel Corp. v. United States*, 515 F.2d 1116, 1127 n.21, 207 Ct.Cl. 84 (1965). The results of Western's backhoe investigation were inconsistent with those shown on sheet 002. This again should have put Western on notice that contractual indications were suspect. Umpqua's changed conditions claim founders on the rock of reasonable reliance.

Umpqua next contends that even if Western Pacific was somehow negligent in relying on the information in sheet 002, the harbor district and Swinc were also negligent in the manner in which they developed and presented the results of the test hole borings. Because California law applies in this diversity context, the loss resulting from the unforeseen conditions should be apportioned among or between the parties through the comparative negligence mechanism.

■ The district court entered factual findings that Swinc was negligent neither in its preparation and presentation of the plans nor in its investigation and determination of Western's changed conditions claims. The trial judge made no findings regarding the harbor district's possible negligence. However, because the only tort liability Umpqua assigns to the harbor dis-

---

**4.** *See* note 1 *supra*.

trict flows from the harbor district's endorsement of Swinc's actions, the trial court's finding concerning Swinc implicitly deny negligence by the harbor district. These findings must be sustained unless clearly erroneous.

Umpqua argues that the district court's findings concerning negligence are not entitled to deference under Fed.R.Civ.P. 52(a) because they conflict with other factual findings by the court. Specifically, Umpqua contrasts the trial court's finding that "Western Pacific's reliance, if any, on the information contained on sheet 002 was unreasonable .. . . in light of the manner in which the information was presented" with the court's finding that "Swinc was not negligent in the preparation and furnishing of the Plans and Specifications." If Swinc was not negligent in presenting the data on sheet 002, Umpqua reasons, then reliance on that information should have been reasonable.

We do not agree that these findings are contradictory. The district court's finding regarding unreasonable reliance reflects testimony at trial that even a cursory reading of the test hole data reproduced on sheet 002 would reveal that those results were reliable only as describing bedrock depth and were not intended to show dredging conditions. While Swinc's presentation of the test hole data for the limited purpose of indicating bedrock elevation was not negligent, Umpqua's reliance on sheet 002 for dredging information was unreasonable.

We affirm the district court's findings concerning Swinc's negligence as not clearly erroneous. Because neither Swinc nor, by implication, the harbor district, was negligent, neither can be liable as comparatively negligent.

■ Umpqua contends, finally, that Western, as a third-party beneficiary of Swinc's design contract with the harbor dis-

trict, may recover for Swinc's preparation of inaccurate plans and specifications, in breach of that contract. Again, the district court found that Swinc did not misrepresent subsurface conditions at the project site and that it was negligent neither in its preparation of the plans and specifications nor in its investigation of Western's changed conditions claim. We are not persuaded that these findings were in error. Swinc did not breach its contract with the harbor district.

Because neither the harbor district nor Swinc is liable to Umpqua under any theory, we need not determine whether Swinc would have been obliged to indemnify the harbor district had such liability existed. Accordingly, the trial court's judgment for Swinc on the harbor district's indemnity action was proper.

■ Swinc, as the "prevailing party" in the indemnity action, claims that it is entitled to recover its costs and attorney's fees from the harbor district under Clause VI–7 of the District-Swinc contract.[5] We agree that had Swinc been named only in the harbor district's indemnity action, it would have been entitled to costs and fees. Here, however, Swinc was simultaneously defending two actions on identical grounds. Some, if not all, of Swinc's litigation costs were attributable to its defense against Umpqua's claims, and it is virtually impossible to apportion these expenses between the two actions. Swinc was also an incidental beneficiary of the harbor district's expenditures in defending against Umpqua's claims. In these circumstances, we believe that Swinc and the harbor district should bear their respective costs and fees.

The district court's judgments are affirmed. .

---

5. Article VI–7 of the "Agreement for Engineering Services" between the District and Swinc reads as follows:

"In any litigation or arbitration proceedings between the parties concerning this Agreement, the party, DISTRICT or ENGINEERS,

prevailing in such litigation or proceedings shall be entitled, in addition to such other relief as may be granted, to a reasonable sum as and for Attorney's fees in such litigation proceedings."