GRANITE–GROVES, et al.

v.

**WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY,**
Appellant.

No. 87–7148.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 26, 1988.
Decided April 22, 1988.

Gerard J. Stief, with whom Sara E. Lister, Robert L. Polk, Thomas B. Dorrier and William B. Bircher, Washington, D.C., were on the brief, for appellant.

Darrell P. McCrory, with whom G. Robert Hale was on the brief for appellees.

Before WALD, Chief Judge, SILBERMAN and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

1. Granite–Groves is a joint venture composed of Granite Construction Company and S.J. Groves

WALD, Chief Judge.

This appeal arises out of a contract between appellant Washington Metropolitan Area Transit Authority (WMATA) and appellee Granite–Groves[1] (Contractor) for the construction of a part of the Washington, D.C. subway system. During performance of the contract, Granite–Groves asserted two claims for additional compensation, to wit: (1) claim No. 4251 for additional tunneling costs that were allegedly incurred because the subsurface conditions encountered by the contractor differed materially from those indicated in the pre-bid documents; and (2) claim No. 4045 for additional realignment costs which, according to Granite–Groves, were necessary because of improper tunneling restrictions imposed by WMATA. In March 1978 and March 1979, WMATA's Contracting Officer denied both claims in their entirety. Since then, this case has been appealed to, and heard by, the United States Army Corps of Engineers Board of Contract Appeals (Board or BCA); WMATA's General Manager; the United States District Court for the District of Columbia; and now this Court of Appeals.

In claim No. 4251 we, like the district court, uphold the Board's factual determination that during construction of the tunnels Granite–Groves encountered continual sand and water intrusion problems, most of which occurred in two sections of the project: between Stations 176 + 75 and 175 + 25 (Problem Site 1) and between Stations 180 + 00 and 178 + 50 (Problem Site 2). We differ with the district court, however, concluding as a matter of law that Granite–Groves should have foreseen from plain indications in the contract documents the unfavorable mining conditions it encountered at Problem Site 1; but that Granite–Groves is entitled to an equitable adjustment of the contract price because the tunneling conditions it encountered at Problem Site 2 were materially different from those

& Sons Company. *See* Appellant's Brief at i.

indicated in the contract documents. Because we lack the data needed to determine the precise amount of additional compensation due the contractor, we remand claim No. 4251 for WMATA's General Manager to do so.

In claim No. 4045, the parties do not dispute that Granite–Groves is entitled to an award of $390,000 for additional realignment work done; and that Granite–Groves is entitled to statutory interest on the award, because WMATA's Contracting Officer delayed unreasonably in processing the claim. *See* D.C.Code § 15–109. The only issue on appeal concerns the appropriate period for the payment of interest. We agree with the district court that under *General Ry. Signal Co. v. Washington Metrop. Area Transit Auth.*, 527 F.Supp. 359 (D.D.C.1979), *aff'd*, 664 F.2d 296 (D.C. Cir.1980), *cert. denied*, 452 U.S. 915, 101 S.Ct. 3049, 69 L.Ed.2d 418 (1981), a contractor who has been subjected to unreasonable delay is entitled to recover interest for the full period from the completion of the additional work until the time of final payment. We therefore affirm the district court on claim No. 4045.

BACKGROUND

On or about September 13, 1973, pursuant to public competitive bidding, the appellee Granite–Groves entered into a written contract with WMATA, the appellant, for the construction of a portion of the Washington, D.C. subway system. The project (commonly known as Section D008) included the mining and construction of 5,265 linear feet of tunnel at a depth of approximately 40–55 feet below ground surface. The contract documents called for two tunnels, one inbound and one outbound, running from the vicinity of G and 15th Streets, S.E. to C and 19th Streets, S.E.

*See* Joint Appendix (J.A.) at 19; Appellant's Brief at 27.

During the mining of the tunnels, Granite–Groves asserted two major claims for equitable adjustment of the contract price. ENG BCA No. 4045 was a claim under the "Changes" article of the contract[2] in the approximate sum of $423,000 for the cost of realigning a part of the inbound tunnel. Granite–Groves alleged that the realignment was necessitated by improper tunneling restrictions imposed upon the contractor by WMATA. The other claim (ENG BCA No. 4251) arose out of the "Differing Site Conditions" clause of the contract[3]; Granite–Groves sought approximately $1,500,000 for the cost of the additional tunneling work allegedly required because Granite–Groves encountered substantial amounts of sand and water instead of the dry clay indicated in the contract documents. *See* J.A. at 19.

Under the "Disputes" clause in the parties' contract, WMATA's Contracting Officer makes the initial decision on a contract claim. *See id.* at 38–39. A party to the contract may appeal this decision to WMATA's Board of Directors, which, by formal resolution, has designated the Board of Contract Appeals to conduct evidentiary hearings and issue advisory opinions and has appointed WMATA's General Manager to review these opinions and decide the appeals. *See George Hyman Constr. Co. v. Washington Metrop. Area Transit Auth.*, 816 F.2d 753, 755 (D.C.Cir.1987). In this case, Granite–Groves submitted its contract claims in September 1975. *See* J.A. at 32. WMATA's Contracting Officer considered the claims and, over two years later, denied them in their entirety. Granite–Groves entered a timely appeal, and hearings on the claims were conducted by the BCA during 1980. On November 16,

---

**2.** The Changes article provides in relevant part:
 If any change under this article causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, ... an equitable adjustment shall be made....
 J.A. at 36 (quoting Article 1.3).

**3.** The Differing Site Conditions article provides in relevant part:

The Contractor shall promptly ... notify the Contracting Officer in writing of (1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract.... [If the Contracting Officer] finds that such conditions do materially so differ ... an equitable adjustment shall be made....
 *Id.* at 37 (quoting Article 1.4(a)).

1984, the Board denied the contractor's differing site conditions claim (No. 4251) but found that it was entitled to recover on its realignment claim (No. 4045). On the latter claim, the BCA also found that because the Contracting Officer's final decision had been unreasonably delayed the contractor was entitled to statutory interest of 6% on the award to run from October 30, 1975, the day Granite–Groves completed the additional realignment work, until the claim was paid. *See* Appellee's Brief at 2–5.

WMATA's General Manager adopted the Board's recommendation that claim No. 4251 be denied in its entirety. The General Manager also adopted the Board's recommended award in claim No. 4045 except for the portion granting interest for the full period until the time the claim was paid; the General Manager decided instead that the contractor should recover interest on the award only for the period from September 1, 1976, the date Granite–Groves requested that the interest commence, through March 28, 1978, the day the Contracting Officer issued his final decision. Granite–Groves sought judicial review of the General Manager's decision. Cross-motions for summary judgment were filed by the parties after the record before the Board had been submitted to the district court. On June 17, 1987, the district court issued a memorandum opinion and judgment reversing the General Manager and holding that the contractor was entitled to summary judgment on both issues presented for review. Specifically, the district court found that on claim No. 4251 Granite–Groves encountered differing site conditions and thus was entitled to an equitable adjustment of the price of the contract; and that Granite–Groves was entitled to interest on claim No. 4045 for the entire period until the claim was paid (as had been decided by the Board). This appeal followed.

### DISCUSSION

### I. THE DIFFERING SITE CONDITIONS CLAIM

#### A. *Standard of Review*

Under the Disputes clause, which essentially incorporates the standard of review set forth in the Wunderlich Act, "[t]he decision of [WMATA's] Board of Directors or its duly authorized representative ... shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence." J.A. at 39; *see also* 41 U.S.C. § 321 (1987). The Disputes clause, in accordance with the Act, goes on to state that "Nothing in this contract ... shall be construed as making final the decisions of the Board of Directors or its representatives on *a question of law*." J.A. at 39 (emphasis added); *see also* 41 U.S.C. § 322.

■■■ Success on a changed conditions claim turns on the contractor's ability to demonstrate that the conditions it encountered during performance differed materially from those "indicated" in the contract documents. *See P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984). The Board's determination as to the conditions that were actually encountered during the performance of the contract is purely factual in nature and therefore is entitled to finality where supported by substantial evidence and not otherwise arbitrary. *Arundel Corp. v. United States*, 515 F.2d 1116, 1123, 207 Ct.Cl. 84 (1975); *Dale Ingram, Inc. v. United States*, 475 F.2d 1177, 1184, 201 Ct.Cl. 56 (1973); *Foster Constr. C.A. & William Bros. Co. v. United States*, 435 F.2d 873, 878, 193 Ct.Cl. 587 (1970). In this case, there is no dispute over the actual conditions encountered; the parties agree that Granite–Groves experienced sand and water intrusion problems during tunneling. *See* J.A. at 19, 25. The only question here is whether materially different subsurface conditions were indicated in the contract between Granite–Groves and the WMATA. Determination of the claimed contract indications is a matter involving analysis and interpretation of the contract documents, and thus presents a question of law for the court to decide independently of the deci-

sion of the Board. *See, e.g., P.J. Maffei,* 732 F.2d at 916–17; *George Hyman Constr. Co. v. United States,* 564 F.2d 939, 944, 215 Ct.Cl. 70 (1977); *Foster,* 435 F.2d at 880; *Arundel,* 515 F.2d at 1123. In interpreting a contract, it is proper for the court to place itself "into the shoes of a 'reasonable and prudent' contractor" and decide how such a contractor would act in the situation at hand. *H.N. Bailey & Associates v. United States,* 449 F.2d 387, 390, 196 Ct.Cl. 156 (1971), *quoted in P.J. Maffei,* 732 F.2d at 917). However, where the Board's interpretation of a contract is reasonable and based on the Board's expertise, its determination, while not binding, will be given careful consideration and accorded great respect. *McCollum v. United States,* 6 Cl.Ct. 373, 375 (1984); *Raytheon Co. v. United States,* 2 Cl.Ct. 763, 767 (1983); *George Hyman,* 564 F.2d at 944; *Dale Ingram,* 475 F.2d at 1177; *Winston Bros. Co. v. United States,* 458 F.2d 49, 54, 198 Ct.Cl. 37 (Ct.Cl.1972) (stating that while court is not bound by Board's contract interpretations, "we accord them great respect, as emanating from a source having expertise").

## B. *The Conditions Encountered*

It is common knowledge among contractors that sand is less firm and more permeable to water than is clay.[4] Accordingly, during the design of Section D008 and prior to bid, WMATA decided to lower the elevation of the tunnels from that originally planned, in an attempt to avoid mining in sand and "to place [the tunnels] in a horizon of highly plastic homogeneous clays of relative impermeability so as to create easier tunneling and lower cost." J.A. at 20 (citing Mueser, Rutledge, Wentworth & Johnston, Report No. 18 [hereinafter Rep. No. 18] at 1). Nevertheless, the Board found, and the parties do not dispute, that after construction of the tunnels began, Granite–Groves encountered not the "kind embrace of clay,"[5] but rather "repeated and continual" sand and water intrusion problems. *Id.* at 25. These problems were described by the Board, as follows:

> The contractor encountered little difficulty ... between Station 187 + 64.5 and 184 + 16 where the soils was hard plastic clay. *Between Station 184 + 16 and the (G) Street vent shaft [Approx. station 175 + 50], the contractor encountered a sandier materials which coupled with water intrusion, resulted in numerous tunnel cave-ins and related problems.* Without citing the individual occurrences, the difficulties encountered can be succinctly described as water, and water borne soil materials entering the tunnel through the tunnel face and lagging several times chimneying to the street surface.

*Id.* at 25 (emphasis added) (quoting the Contracting Officer's decision). According to the Board, most of the water intrusion problems occurred in two particular sections of the project:

> The next question for determination is the location of the area affected by the water. From an examination of all the evidence we have concluded that these areas include *from Station 180 + 00 to 178 + 50 and from Station 176 + 75 to 175 + 25* [where the contractor encountered sandy soil containing abundant water].

*Id.* at 28–29 (emphasis added). We hold, like the district court, that the Board's factual determinations regarding the conditions encountered by the contractor must be accorded finality, because they were not arbitrary, capricious or grossly erroneous and were supported by substantial evidence.

---

4. *See, e.g., Foster,* 435 F.2d 873. The *Foster* court explained:

   As amateur gardeners know, the presence of clay tends to make soil impermeable. It is elementary soils learning that clay molecules are cohesive and bind the soil together to resist the flow of water, to the point that clay-type materials may be virtually impermeable. On the other hand, granular materials, such as sand, lack the molecular attraction of clay and are held together only by the friction of their touching particles.
   *Id.* at 882.

5. Elinor Wylie, "Hymn to Earth," st. 7 (1929), *quoted in* Bartlett, *Familiar Quotations,* 935a (13th & Centennial ed. 1955).

C. *The Contract Documents and Pre-Bid Information Provided to Granite-Groves*

In making its bid, the contractor relied on several sources of subsurface data furnished by WMATA. First, WMATA provided a series of drawings in the contract plans, describing for the entire length of the project (Section D008) the locations of certain subsurface exploratory borings performed by a soil investigation firm.[6] *See* J.A. at 40–43 (reduced reproductions of the contract drawings); Rep. No. 18 at 1. The exact locations of the borings are described in terms of "Stations"; Station 174 + 82, for example, marks the approximate start of Project D008. *See* J.A. at 40. Second, for each exploratory boring, WMATA provided prospective bidders with a detailed "log" of the soil conditions and major soil layers encountered at each five foot interval from the ground surface to the base of the project. These boring logs were prepared for WMATA by Mueser, Rutledge, Wentworth & Johnston (MRW & J), a geotechnical engineering consultant firm. *See id.* at 44–50.

Additionally, two soils reports prepared by MRW & J, known as Volume IV, which was the original report (July 1969), and Rep. No. 18, the supplemental report (September 1972), were available to Granite-Groves prior to its bid submission. *See* Appellant's Brief at 26. Particularly relevant is Rep. No. 18, which contained MRW & J's interpretation (in narrative form) of the boring log data presented in the contract plans as well as soil "profiles" of the tunnel horizon, which were also based on the boring logs and which presented pictorially the subsurface strata the contractor could expect to encounter. *See* J.A. at 20. The tunnel profiles from Rep. No. 18 are reproduced in relevant part in Appendix A.[7]

The abbreviations used in the soil profiles and boring logs were based on the following soil classification system:

6. Some twenty-odd borings (identified by prefix "X") were completed in February 1969. Fourteen additional borings (with the prefix "HD") were performed in July and August 1972. Because the "X" borings were made before the proposed elevation of the tunnels was lowered, they do not extend to the bottom of the project. *See* WMATA's Response to the Court's Order of March 11, 1988 at 2.

7. We marked on the tunnel profile in Appendix A the approximate location of the two major problem sites. In addition, the 1969 stationing numbers used in the profiles are out of date. We replaced the 1969 station numbers with 1972 station numbers, which were the numbers used by the Board (in its opinion) and by MRW & J (in the soils reports) to identify the location of problem areas and boring holes. *See* J.A. at 40–43.

## UNIFIED CLASSIFICATION SYSTEM

| | | | | |
|---|---|---|---|---|
| COARSE GRAINED SOILS (MORE THAN HALF LARGER THAN NO.200 SIEVE) | GRAVELS AND GRAVELLY SOILS (MORE THAN HALF OF COARSE FRACTION IS LARGER THAN NO.4) | CLEAN (LESS THAN 5% SMALLER THAN NO.200) | GW<br>GP<br>GP-GM | WELL GRADED GRAVEL, LITTLE OR NO FINES.<br>SINGLE-SIZE, NARROWLY GRADED GRAVEL, FEW FINES<br>GRAVEL WITH MODERATE FINES, 5% TO 12% PASSING NO.200. |
| | | DIRTY (MORE THAN 12% SMALLER THAN NO.200) | GM<br>GC<br>GM-GC | SILTY GRAVEL, GRAVEL-SAND-SILT MIXTURES.<br>CLAYEY GRAVEL, GRAVEL-SAND-CLAY MIXTURES.<br>GRAVEL-SAND MIX WITH SILTY CLAY OR CLAYEY SILT FINES. |
| | SANDS AND SANDY SOILS (MORE THAN HALF OF COARSE FRACTION IS SMALLER THAN NO.4) | CLEAN (LESS THAN 5% SMALLER THAN NO.200) | SW<br>SP<br>SP-SM | WELL GRADED SAND, LITTLE OR NO FINES.<br>SINGLE-SIZE NARROWLY GRADED SAND, FEW FINES.<br>SAND WITH MODERATE FINES, 5% TO 12% PASSING NO.200. |
| | | DIRTY (MORE THAN 12% SMALLER THAN NO.200) | SM<br>SC<br>SM-SC | SILTY SAND, SAND-SILT MIXTURES.<br>CLAYEY SAND, SAND-CLAY MIXTURES<br>SAND WITH SILTY CLAY OR CLAYEY SILT FINES. |
| FINE GRAINED SOILS (MORE THAN HALF SMALLER THAN NO.200 SIEVE) | SILTS AND CLAYS LL<50 | | ML<br>CL<br>OL | INORGANIC SILT, ROCK FLOUR, CLAYEY SILT (LIMITS PLOT BELOW A-LINE)<br>INORGANIC CLAY OF LOW TO MEDIUM PLASTICITY (LIMITS PLOT ABOVE A-LINE)<br>ORGANIC SILT AND SILTY CLAY OF LOW PLASTICITY LIMITS PLOT BELOW A-LINE) |
| | SILTS AND CLAYS LL>50 | | MH<br>CH<br>OH | INORGANIC SILT, SPONGY, TALCY, MICACEOUS SILT (LIMITS PLOT BELOW A-LINE)<br>INORGANIC PLASTIC CLAY, TOUGH AND FAT CLAY (LIMITS PLOT ABOVE A-LINE)<br>ORGANIC CLAY OF MEDIUM TO HIGH PLASTICITY (LIMITS PLOT BELOW A-LINE |
| | PEAT AND HIGHLY ORGANIC | | PT | PEAT, HIGHLY ORGANIC SOIL, SPONGY, COMPRESSIBLE, DARK COLOR, FIBROUS, DISTINCT ORGANIC ODOR (LIMITS PLOT BELOW A-LINE) |

*Id.* at 87. MRW & J also developed a more general system for designating different soil strata. A chart entitled "Generalized Strata Descriptions," which was provided to prospective bidders, grouped classes of soils into broader categories such as "P–1," "P–2" or "T–3" stratum. According to the Generalized Strata Descriptions, P–1 material refers to relatively impervious *"clay, with occasional pockets of fine sand"* and is equated to CH and CL. P–2 material, equated to SM and SP, is described as "silty or clayey fine to medium *sand* with pockets of silty clay." T–3 material is described as "fine to coarse sand with some silt and gravel" and is equated to SW, SM, SP and GM. *See id.* at 87 (emphasis added).

### D. *The Board's Determination Regarding the Conditions Indicated*

■ Granite–Groves' basic claim is that the pre-bid documents provided by WMATA indicated that tunneling in Section D008 "would be easy and relatively dry." *Id.* at 28. WMATA argues that Granite–Groves' mining expectations were unreasonable, because the pre-award documents clearly warned bidders that they would encounter substantial amounts of sand and water in particular areas of the project. The Board found in favor of WMATA. Although the Board made extensive factual findings, its ultimate decision on the changed conditions claim was based solely on the following grounds:

> We return once more to the central issue, was [Granite–Grove's] interpretation reasonable? *The answer to this question turns upon one's evaluation of the "S" parts of the profiles and boring logs, the verbal descriptions thereon and the text and tables of the two reports. Finding 15.2 [16]* [8] *shows that there was "S" [sand] above the tunnel and extending into the tunnel.* It also shows that much of it was below the indicated level of ground water.... *Examination of the description of the borings ... reveals the presence of considerable amounts of sand in the areas that caused the most trouble. This sand was both above and in the prospective tunnel.* It was below the ground water levels indicated in the profiles.... We conclude that it was unreasonable for [the contractor] to fail to recognize these

---

**8.** It was made clear at oral argument that there is no Finding 15.2; the Board obviously meant Finding 16.

facts and to over-emphasize the simplified diagramatic nature of the profiles. *Id.* at 29–30 (emphasis and footnote added).

Under *de novo* review, a reviewing court is not bound by the Board's determination as to the claimed contract indications. The district court in this case overruled the Board's determination that it was unreasonable for Granite-Groves to have expected favorable tunneling conditions. In light of our own examination of the pre-bid documents, we too reject the Board's rationale for finding that Granite–Grove's expectations were unreasonably optimistic, but for different reasons than the district court. First and most critically, we find that the Board's reasoning is based on an inaccurate representation of the contractual profiles and boring logs. In analyzing the contract indications, the Board prepared and expressly relied on the following chart (Finding 16), which supposedly replicated the information contained in the profiles and logs prepared by MRW & J:

| Depth | X–6 | HD–1U | X–7 | HD–2 | X–8 | HD–3 |
|---|---|---|---|---|---|---|
| 5 | GC | SM | *CL* | *ML* | ML | CL |
| 10 | SM | SM | — | CL | ML | *SM–CL* |
| 15 | SM | SM | SP–SM | CL | SM–SC | SM |
| 20 | SM | SP–SM | *SM* | SM | SM–SC | SM |
| 25 | *GP* | SP–SM | *SM* | SM | SP | SM |
| 30 | SM | SP–SM | *GP* | SM | SP | CL |
| 35 | CH | CL | *SP–SM* | SM | SP | CL |
| | | (approximate top of tunnel) | | | | |
| 40 | CL | SC–CL | CL | CL | CL | CL |
| 45 | CL & SM | SC–CL | *CL* | CL | CL | CL |
| 50 | SM | CL | *SC & CL* | CL | CL | SM & CL |
| 55 | CL & SM | CL | — | *CL–SM* | CL | SM |
| | | (approximate bottom of tunnel) | | | | |
| 60 | — | SM | — | CL | *CL* | CL |
| 65 | — | CH | — | *CH* | — | — |

*Id.* at 21 (soil strata and water level designations omitted) (Board's errors in italics). In fact, the boring log data actually provided to prospective bidders was the following:

| Depth | X–6 | HD–1U | X–7 | HD–2 | X–8 | HD–3 |
|---|---|---|---|---|---|---|
| 5 | GC | SM | *rock* | *CL* | ML | CL |
| 10 | SM | SM | SP–SM | CL | *SM–SC* | *CL/SM–SC* |
| 15 | SM | SM | *SM* | *SM* | SM–SC | SM |
| 20 | SM | SP–SM | SM | SM | *SP* | SM |
| 25 | *GP–GM* | SP–SM | *GP* | SM | SP | SM |
| 30 | SM | SP–SM | *GP* | SM | SP | CL |
| 35 | CH | CL | *CL* | *SM* | *CL* | CL |
| (36) | | | | *CL* | | |
| 40 | CL | SC–CL | CL | *CH* | CL | CL |
| 45 | CL & SM | SC–CL | *SC & CL* | CL | CL | CL |
| 50 | SM | CL | — | CL | CL | SM & CL |
| 55 | CL & SM | CL | — | *CL–SC* | CL–CH | SM |
| 60 | — | SM | — | CL | — | CL |
| 65 | — | CH | — | *CL–CH* | — | — |

*Id.* at 45, 48.

The Board's chart misrepresents the information in the original profiles and boring logs in several important respects. As we discuss in greater detail below, boring holes X–7, HD–1U and X–8 were all located in the areas of Section D008 that gave Granite–Groves the most trouble. At borings X–7 and X–8 the Board's chart shows

sand (SP, SP–SM) at the 35′ depth, suggesting (mistakenly) that the contract documents indicated the presence of sand just above the top of the tunnel at those borings. In fact, at both borings X–7 and X–8 the original profiles and logs showed not sand but clay (CL) at the 35′ depth. That is, contrary to the Board's representation in Finding 16, the pre-bid logs and profiles indicated to Granite–Groves that at borings X–7 and X–8 there was an intervening clay layer of approximately 5 feet between the top of the tunnel and the P–2 sand.

Also misleading is the BCA's representation of the data for boring hole HD–2. At boring HD–2, the Board's chart shows sand (SM) at the 35′ depth, suggesting again that the contract documents indicated sand just above the tunnel. However, the information actually provided to Granite–Groves was somewhat different: the contractual logs and profiles showed sand at a depth of 35′ but clay from a depth of 36′ to 40′. Contrary to Finding 16, then, the contractual data indicated not sand but rather a clay layer of four feet directly above the tunnel at boring HD–2.

The Board's determination is thus based on a chart, which at important points misrepresents and exaggerates the indications of sand in and above the tunnel in the original contract documents. In our view, the inaccuracies in Finding 16 seriously undermine the main thrust of the Board's decision, which is that Granite–Groves should have known from indications of "S" (sand) "both above and in the prospective tunnel" in the boring log data that it would encounter water intrusion in the areas that turned out to be most problematic. *Id.* at 29. Moreover, because the Board's conclusion turned largely on the "S" indications in the logs and profiles, it failed adequately to take into account the subsurface indications and warnings contained in Volume IV and Rep. No. 18. We believe that the narrow grounds for the Board's decision flies in the face of its own assertion that:

[B]idders were obligated to utilize and evaluate *all* of the pre-awards soils data presented by the owner. . . . *Since Report IV and especially Report 18 were specifically prepared for the D–8 section, bidders were obligated to give more weight to them* than [to] the generalized designations prepared to cover a much wider area.

*Id.* at 29 (emphasis added). We conclude that the Board's determination on the differing site conditions claim cannot stand, because it was based on counterfactual data, and because it disregarded the information and representations in the two soils reports prepared specifically for Project D008.

### E. *Analysis of the Contract Indications*

According to the Board, Granite–Groves encountered the most trouble in the areas from Stations 176 + 75 to 175 + 25 (referred to herein as Problem Site 1) and from Stations 180 + 00 to 178 + 50 (Problem Site 2). *See id.* at 29. In this section, we examine *de novo* the indications in the pre-bid documents concerning the subsurface conditions in those areas. Unlike the district court, we believe the better approach is to analyze the contract indications for the two sites separately, because the subsurface conditions varied significantly across the length of Section D008.

To dig and delve in nice clean dirt Can do a mortal little hurt.[9]

#### 1. *Problem Site 1 (Station 176 + 75 to Station 175 + 25)*

■ The parties agree that Granite–Groves encountered its greatest tunneling problems at the extreme western end of Section D008, between Stations 176 + 75 and 175 + 25, in the area we refer to as Problem Site 1. In our view, there were plain indications of the unfavorable mining conditions at Problem Site 1 in the pre-bid soils reports, boring logs and profiles. We turn first to the two soils reports that were provided to the contractor prior to bid. The district court found that Volume IV and Rep. No. 18 together "contemplated

---

**9.** John Kendrick Bangs, "Gardening," *quoted in* Bartlett, *Familiar Quotations,* 798a (13th & Centennial ed. 1955).

favorable tunneling conditions 'over the entire length of the tunnel.'" *Id.* at 5. We disagree. Section 10.2 of Volume IV, the original soils report, expressly represented that tunneling in Section D008 was expected to be "highly favorable" where "the tunnel cross-section *lies entirely within [medium plastic Patapsco clays of the Cretaceous Potomac formation] with a cover of at least ten feet above the opening.*" *Id.* at 96 (emphasis added). Although we do not consider the presence or absence of a 10 feet clay cover to be an all-or-nothing litmus test for favorable or unfavorable mining conditions, we conclude that it was unreasonable for Granite–Groves to have expected "easy and relatively dry" tunneling conditions between Stations 176 + 75 and 175 + 25, when Rep. No. 18, the supplemental report prepared after the proposed elevations of the tunnels was lowered, made clear that at the extreme westerly end of the project there was *not* a 10 feet cover of Cretaceous clay over the tunnel, but rather sandier material giving rise to the possibility of water inflow. Specifically, section 2.3 of Rep. No. 18 stated:

> *At the west end of the Section D008 near Station 176* in the supplementary Boring No. HD–1U several tests were performed in mixed Strata P1 clays and P2 clayey sands which yielded permeabilities of typically $1 \times 10^{-4}$ fpm. *These values give an indication of the effects of the relatively sandier material within the Cretaceous at the west end of Section D008.*

J.A. at 57 (emphasis added). Section 3.3 provided:

> *Over the western section of the work in the turn from G Street to Potomac Avenue the cover of Cretaceous materials above the tunnel opening is less than 10 feet.* In this same area Borings No. HD–1U and X–6 and X–7 encountered clayey sand of Stratum P2 within the tunnel opening. *Under these conditions the possibility of seepage flow during construction is much greater than in other portions of Section D008* where the material to be excavated is essentially fairly massive clay.

*Id.* at 58 (emphasis added).

In addition to these representations in the soils reports, the boring logs and profiles provided to prospective bidders—which data the district court did not itself examine—contained clear indications of the problematic subsurface conditions between Stations 176 + 75 and 175 + 25. The boring holes relevant to Problem Site 1 are X–6 (located at approximately 174 + 82), HD–1U (located at approximately 176) and X–7 (located at approximately 176) and X–7 (located at approximately 176 + 80), all of which are marked on the tunnel profile in Appendix A. *See id.* at 40. The data for those boring holes was as follows:

| Depth | X–6 | HD–1U | X–7 |
|---|---|---|---|
| 5 | GC | SM | rock |
| 10 | SM | SM | SP–SM |
| 15 | SM | SM | SM |
| 20 | SM | SP–SM | SM |
| 25 | GP–GM | SP–SM | GP |
| 30 | SM | SP–SM | SP–SM |
| 35 | CH | CL | CL |
| 40 | CL | SC–CL | CL |
| 45 | CL & SM | SC–CL | SC & CL |
| 50 | SM | CL | — |
| 55 | CL & SM | CL | — |
| 60 | — | SM | — |

Thus, at boring HD–1U the contractual data showed a clay cover above the tunnel of only about 5', thereby corroborating the representations in Rep. No. 18 that ideal tunneling conditions did not exist in the area between Stations 176 + 75 and 175 + 25. Moreover, the data indicated unambig-

uously that at Problem Site 1 the tunnel cross-section did *not* lie entirely within Cretaceous clays and that therefore (according to Volume IV) the mining conditions in that area were not highly favorable. Specifically, at boring X–6, there were indications of silty sand (SM) or gravel (GP–GM) both *in* the tunnel, at the 45', 50' and 55' depths, and *above* the tunnel, at a depth of 5' to 30'. Similarly, at HD–1U, there are indications of sand and sand-clay mixtures (SC–CL) in the tunnel, at the 40' and 45' depths; above the tunnel, at a depth of approximately 5' to 30'; and just *below* tunnel depth, at the 60' depth. At boring X–7, the logs and profiles show clayey sand (SC) in the tunnel at the 45' depth, and sand and gravel mixtures above the tunnel, at a depth of 10' to 30'. In short, the boring log data shows that at borings X–6, HD–1U and X–7, all of which were located in the vicinity of Problem Site 1, the general soil condition at and above tunnel depth was *not* homogeneous clay, but rather more permeable mixtures of clay, clayey sand and silty sand. These indications in the profiles and logs, coupled with the information in Volume IV and Rep. No. 18, lead us to conclude, in disagreement with the court below, that a reasonable contractor would have foreseen the unfavorable mining conditions encountered by Granite–Groves between Stations 176 + 75 and 175 + 25.

2. *Problem Site 2 (Station 180 + 00 to Station 178 + 50)*

We consider next whether the contract documents provided to bidders contained reasonable indications of the unfavorable tunneling conditions between Stations 180 + 00 and 178 + 50. We turn once again to Volume IV and Rep. No. 18. It is, in our view, significant that whereas the reports contained explicit warnings about the presence of "relatively sandier material" and "the [much greater] possibility of seepage inflow" at the extreme western end of the project (Problem Site 1), *id.* at 57–58, neither Volume IV nor Rep. No.

18 suggested that there would be any difficulty between Stations 180 + 00 and 178 + 50.[10] Moreover, whereas Rep. No. 18 made clear that a 10 feet Cretaceous clay cover did not exist at Problem 1, the report made no such observation about Problem Site 2—or for that matter about any other portion of Section D008.

WMATA, however, contends that Rep. No. 18 *did* forewarn Granite–Groves about the unfavorable conditions at Problem Site 2. WMATA relies specifically on the Board's Finding of Fact 22, which states:

> *The following phrase in Report No. 18 was one indication to [contractor] that significant tunneling risks existed in the tunnels between Stations 175 and 182* due to the presence of larger amounts of sandier materials: "under these conditions the possibility of seepage inflow during construction is much greater than in other portions of Section D008 where the materials to be excavated is essentially fairly massive clay."

*Id.* at 23 (emphasis added). In fact, the "following phrase in Report No. 18" was taken out of context by the Board. The original phrase referred unambiguously and exclusively to the conditions in the westernmost 10% of the project (Problem Site 1) and *not* to the entire area between Stations 175 and 182. The passage from which the Board quoted read in its entirety, as follows:

> *Over the western section of the work* ... the cover of Cretaceous materials above the tunnel opening is less than 10 feet. *In this same area* Borings No. HD–1U and X–6 and X–7 encountered clayey sand of Stratum P–2 within the tunnel opening. *Under these conditions* the possibility of seepage inflow during construction is much greater than in other portions of Section D008 where the materials to be excavated is essentially fairly massive clay.

---

10. Indeed, the only specific reference to Problem Site 2 is in the following, rather ambiguous, passage from Rep. No. 18:

In general the problems of water control are not expected to be of major magnitude. In

the section between Stations 175 and 182 [which included Problem Site 2] systematic pre-drainage in advance of tunnel excavation should be stipulated in the specifications. J.A. at 58.

*Id.* at 58 (emphasis added). Thus, WMATA's claim that the conditions at Problem Site 2 were indicated in the pre-bid reports is without merit because it is based on a misrepresentation by the Board.

Having found no indications in either Volume IV or Rep. No. 18 of unpropitious tunneling conditions between Stations 180 + 00 and 178 + 50, we look next to the subsurface indications in the boring log data. The relevant boring holes for Problem Site 2 are X–8 (located at approximately 179 + 60) and HD–2 (located at approximately 178 + 10); again, both borings are marked on the tunnel profile in Appendix A. *See also id.* at 40. The parties agree that at boring X–8 the data indicated a clay cover of approximately 12′ to 12.5′ above the tunnel. *See* WMATA's Response to the Court's March 11, 1988 Order at 2; Appellee's Response to Court Order at 2. Further, *in* the tunnel at boring X–8, at a depth of approximately 40′ to 55′, the logs and profiles indicated only clay, and no sand at all. In other words, at boring X–8 the contractual data clearly indicated that a clay cover of more than 10′ was present and, moreover, the tunnel cross-section lay entirely within Cretaceous clays. Thus, according to the representations in Volume IV, the subsurface conditions at boring X–8 were "highly favorable." *Id.* at 96.

The indications regarding the conditions at boring HD–2 are less straightforward. The parties agree that at that boring the logs and profiles showed a clay cover over the tunnel opening of approximately 9.2′— slightly short of the 10′ necessary, according to Volume IV, for ideal mining conditions. *See* WMATA's Response to the Court's March 11, 1988 Order at 3; Appellee's Response to Court Order at 2. As we have stated, however, the presence or absence of a 10′ clay cover is not an all-or-nothing litmus test for favorable or unfavorable mining conditions. In our view, a reasonable contractor, without more, would *not* have inferred from the indication of a 9.2′ cover at boring HD–2 that there would be continual sand and water intrusion problems between Stations 180 + 00 and 178 + 50—particularly in light of the positive subsurface indications at boring X–8. In sum,

we believe that the logs and profiles for borings X–8 and HD–2, interpreted in conjunction with the information in the soils reports, did not alert Granite–Groves to the unfavorable tunneling conditions between Stations 180 + 00 and 178 + 50.

Finally, WMATA argues that the contractor should have foreseen the tunneling problems encountered at Problem Site 2, because of a report submitted to Granite–Groves by a prospective dewatering subcontractor, prior to award of the contract. The subcontractor's report stated that its analysis of the contract documents indicated:

> a general soil condition of sand and gravel overlying clay or silty clay.... The portion of the job between station 175 and 183 [the western end of the project] is indicated to have dense silty sand in the face of the tunnel. *There is not sufficient data available at this time to determine whether or not it will be troublesome to a mining operation.*

J.A. at 23 (emphasis added). The prospective subcontractor went on to propose a solution and a price:

> If the silty sand layer proves to be a problem we will design a system to make it workable. It should be noted at this time that such a system could cost, assuming the worst conditions exist, between $750,000 and $1,000,000 to furnish, install, operate for a year, and remove.

*Id.* at 24. The subcontractor's proposal was rejected by Granite–Groves.

As can be seen in Appendix A, the reference in the subcontractor's report to the area "between Stations 175 and 183" covers a lot of ground; it includes not just Problem Site 2 but also Problem Site 1 and all the area in between. In our view, a reasonable contractor would not have anticipated from the indications in the dewatering report that it would encounter unfavorable mining conditions at Problem Site 2, because the report does not specifically mention or discuss the section between Stations 180 + 00 and 178 + 50 and because the report states expressly that there was *not sufficient data* available to determine

whether the silty sand in the tunnel face would be troublesome.

### F. *Summary*

Like the court below, we uphold the Board's factual determinations regarding the conditions encountered by the contractor, because they were not arbitrary, capricious or grossly erroneous and were supported by substantial evidence. We differ with the district court, however, in concluding as a matter of law that the unfavorable mining conditions encountered at Problem Site 1 (Stations 176 + 75 to 175 + 25) were reasonably forseeable from the indications in the pre-bid documents; but we agree with the district court that Granite–Groves is entitled to an equitable adjustment of the contract price because the subsurface conditions it encountered between Stations 180 + 00 and 178 + 50 (Problem Site 2) differed materially from those indicated in the contract documents.

Granite–Groves sought a total of approximately $1,500,000 on its differing site conditions claim. In light of our holding, the additional compensation to be awarded Granite–Groves should be limited to the costs it incurred as a result of the differing conditions it encountered between Stations 180 + 00 and 178 + 50. Unfortunately, however, neither the contractor nor the BCA has specified what portion of the $1,500,000 figure is attributable to the sand and water intrusions experienced at Problem Site 2. We therefore remand claim No. 4251 for WMATA's General Manager to determine the precise amount of equitable adjustment due Granite–Groves, because we lack the data to do so ourselves.

### II. THE INTEREST ISSUE IN REALIGNMENT CLAIM NO. 4045

■ The Board found that Granite–Groves was entitled to recover $390,913 on claim No. 4045, for the realignment costs necessitated by improper tunneling restrictions imposed by WMATA. The Board also found that because the Contracting Officer's final decision had been unreasonably delayed, the contractor was entitled to stat-

utory interest of 6% on the award, to run from October 30, 1975, the date Granite–Groves completed the additional work, until the claim was paid (June 1986 as it turned out). WMATA's General Manager adopted the Board's recommended award in claim No. 4045 except for the portion granting interest for the full period until payment of the claim; the General Manager decided instead that the contractor should recover interest on the award only for the period of the Contracting Officer's unreasonable delay—that is, from September 1, 1976, the date Granite–Groves requested that the interest commence, through March 26, 1978, the day the Contracting Officer issued his final decision. On judicial review, the district court reversed the General Manager's decision on claim No. 4045 and reinstated the Board's grant of interest for the entire period until the claim was paid. The only aspect of claim No. 4045 now on appeal concerns the appropriate period for the payment of interest. The parties agree that this question is one of law, subject to *de novo* review by this court. *See* Appellee's Brief at 13; Appellant's Brief at 19, 31.

We affirm the district court. The precise issue before us is governed by *General Ry. Signal Co. v. Washington Metrop. Area Transit Auth.*, 527 F.Supp. 359 (D.D.C. 1979), *aff'd*, 664 F.2d 296 (D.C.Cir.1980), *cert. denied*, 452 U.S. 915, 101 S.Ct. 3049, 69 L.Ed.2d 418 (1981). In *General Railway*, the district court held that an unreasonable delay by WMATA's Contracting Officer in processing claims for extra work constituted a breach of contract, and rendered the contractor eligible for a discretionary award of interest under D.C.Code § 15–109. With regard to the period for interest payment, the Court held:

> the plaintiff will be made whole if interest is awarded *from the time, after completion of the work, when the plaintiff first requested payment until defendant made final payment,* plus interest in the statutory amount on the sum of the foregoing interest from the time of final payment, ... until paid

*Id.* at 361 (emphasis added).[11]

Under *General Railway,* then, a contractor who has been subject to unreasonable delay is entitled to recover interest for the full period until the claim is paid. Accordingly, it was erroneous as a matter of law for the General Manager in this case to limit Granite–Groves' interest award to the period of the Contracting Officer's unreasonable delay. In our view, there was substantial evidence in the record to support the Board's finding that Granite–Groves completed its extra work in October 1975 and that it had demanded payment earlier, in December 1974. No one disputes that WMATA did not make final payment on the claim until June 1986. We conclude, therefore, that the district court properly reinstated the Board's decision to grant interest for the full period, as it turns out, between October 1975 and June 1986.

**11.** WMATA also argues that it was WMATA's General Manager, and not the district court, who had discretion under D.C.Code § 15–109 over the award of interest. This is simply not true. Section 15–109 provides in relevant part: [T]his section does not preclude the jury, *or the court,* if the trial be by the court, from

CONCLUSION

For the foregoing reasons, we reject the district court's holding in claim No. 4251 that *all* of the subsurface conditions encountered by Granite–Groves were materially different from the contract indications. We conclude as a matter of law that the contract should have foreseen the unfavorable mining conditions between Stations 176 + 75 and 175 + 25 but that the tunneling conditions it encountered between stations 180 + 00 and 178 + 50 differed materially from those indicated in the pre-bid documents. We affirm the district court on claim No. 4045.

*Affirmed in part; reversed in part and remanded to the General Manager for adjustment of the contract price to reflect unanticipated conditions at Problem Site 2.*

including interest as an element in the damages awarded, if necessary to fully compensate the plaintiff.
(Emphasis added).

344

# APPENDIX A

NOTE: The marked locations of the problem sites and boring holes are merely rough approximations by this court.