**KINGSTON CONSTRUCTORS, INC., Plaintiff,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Defendant.**

Civil Action No. 95–02097.

United States District Court, District of Columbia.

June 7, 1996.

---

Robert Knight Cox, Watt, Tieder & Hoffar, Llp., McLean, VA, for Kingston Constructors Inc.

Thomas Bentley Dorrier, Washington Metropolitan Area Transit Authority, Office of General Counsel, Washington, DC, for Washington Metropolitan Area Transit Authority.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This matter comes before the Court on cross motions for summary judgment.[1] Plaintiff appeals from a decision by the Corps of Engineers Board of Contract Appeals ("the Board"), denying its claim for an equitable adjustment in the price of a contract to replace certain electrical transformers utilized in defendant's rail system. Defendant asks this Court to grant summary affirmance of the Board's decision.

## BACKGROUND

This case involves a contract between defendant Washington Metropolitan Transit Authority ("WMATA") and plaintiff Kingston Constructors, Inc. ("Kingston"). The contract called for Kingston to remove and destroy all of the electrical transformers in WMATA's rapid transit rail system that used liquid polychlorinated biphenyl (PCB).[2] The contract further called for Kingston to procure and install 53 dry-type replacement transformers. The 53 replacement transformers were to be manufactured by Power Energy Industries ("PEI"), a subcontractor identified by Kingston and approved by WMATA.

The contract had a specified price of $4,422,000.00 and was to be completed by March 25, 1992. Among other terms, the contract called for liquidated damages of $1,000 for each calendar day of delay in completion beyond the time specified.

After PEI had produced some six units, testing of one of the units revealed that there was misplaced insulation within the unit which caused a short circuit problem. Approximately one month later, in early October 1991, two other units failed testing and were found to have the same insulation defect. Following additional testing, WMATA authorized Kingston/PEI to begin installation of the transformers. Upon installation of the first transformer—which had passed all routine and induced voltage tests—the unit functioned for a few minutes and then failed, creating a great outpouring of smoke. PEI concluded that the failure was due to misplaced insulation.

The parties then renewed discussions about how to ensure the integrity of the transformers. Such assurances were particularly important because the continuity of WMATA's rail transit system was totally dependent on the reliability of the transformers. Kingston proposed a visual inspection test which involved cutting a window into each transformer. This would allow an inspector to look at the unit to determine

---

1. Defendant has also moved to strike plaintiff's statement of undisputed facts. Because this is an appeal from an administrative decision, the Court must look only to the administrative record in deciding whether the factual findings made below were arbitrary, capricious or not supported by substantial evidence. Accordingly, the Court will grant defendant's motion to strike plaintiff's statement of undisputed facts. The Court notes, however, that there is nothing in plaintiff's statement of facts which would materially alter this Court's substantive decisions in this case.

2. Use of PCB-filled units was incompatible with applicable environmental standards.

whether the insulation was properly placed. WMATA rejected the visual inspection test out of concern that such an incision might significantly shorten the life of the transformer.

Meanwhile, at the request of Kingston/PEI, the MET Electrical Testing Company of Baltimore performed extended applied voltage tests (also called "hi-pot" tests) on 11 transformers located at the Manassas warehouse. Six transformers failed this test, including at least one that was known to be free of the misplaced insulation problem.

By this time, PEI had manufactured a total of 22 transformers. The numerous failures had significantly lessened WMATA's confidence not only in the integrity of the transformers but also in the validity of the Kingston/PEI testing program. Accordingly, as a condition for accepting the 22 transformers, WMATA required that two transformers again undergo complete design and routine tests, this time by KEMA Laboratory, an independent laboratory selected by Kingston.

The prescribed tests were conducted at KEMA Laboratories from February 19–24, 1992. Both transformers failed the tests. By this time, WMATA had completely lost confidence in the transformers and rejected the entire lot. Kingston reprocured the transformers from another manufacturer and eventually completed the contract. Due principally to WMATA's rejection of the 22 PEI transformers, Kingston incurred substantial additional costs and liquidated damages charges.[3]

Kingston asked the Board to grant an equitable adjustment in the amount of the contract ($1,424,457.00) and a time extension of at least 286 calendar days for completion of the contract. After a nine day trial, the Board granted in part Kingston's request, awarding Kingston $254,171.00. Specifically, the Board concluded that Kingston was entitled to an equitable adjustment in the costs and delays associated with all extra-contractual testing, as well as a reduction in liquidated damages from $1,000 to $500 per day

for each day of unexcused delay in contract completion.

Kingston now seeks judicial review of the administrative decision on the grounds that the Board committed errors of law and made factual findings which were not supported by substantial evidence.

## STANDARD OF REVIEW

■ The standard of review in this case is governed by the contract itself which states that the decision of the U.S. Army Corps of Engineers Board of Contract Appeals "shall be final and conclusive unless [a court of competent jurisdiction] determines the decision to have been fraudulent, or capricious or not supported by substantial evidence." The contract also states that "Nothing in this Contract ... shall be construed as making final the decisions of the Board of Directors or its representative on a question of law." Accordingly, this Court may reverse the decision below only if that decision is (1) erroneous as a matter of law; (2) based on findings of fact which are fraudulent, capricious, arbitrary, or so grossly erroneous as to imply bad faith; or (3) not supported by substantial evidence. *See Granite–Groves v. Washington Metropolitan Area Transit Authority,* 845 F.2d 330, 333 (D.C.Cir.1988).

## DISCUSSION AND DECISION

Plaintiff asserts three primary arguments in support of its motion for summary judgment: (1) that the Board's findings of fact were not supported by substantial evidence; (2) that the Board committed errors of law in refusing to apply the economic waste doctrine and in refusing to sever the contract and require WMATA to accept the PEI transformers which had passed all the tests; and (3) that the Board committed an error of law in partially enforcing the liquidated damages clause.

1. *Kingston's Claim that the Board's Findings of Fact Were Arbitrary and Capricious and Not Supported by Substantial Evidence*

■ With respect to plaintiff's first argument, Kingston claims that the evidence does

3. A detailed description of the facts surrounding the contract negotiations and performance—including the pattern of repeated test failures of the

transformers manufactured by PEI—can be found at ENG BCA No. 6006, 95–2 BCA ¶ 27,-841, 1995 WL 452072 (1995).

not support the Board's conclusion that the transformers had more than one defect or that the transformers had incurred an "excessive" number of test failures. But for such erroneous findings, Kingston argues, the Board would not have concluded that WMATA was legally justified in rejecting all the transformers.

Kingston asserts that the unanimous testimony indicated that the only fault identified was the mislocation of the insulation. This ignores the results of numerous tests which identified problems not related to the insulation defect. For example, the two transformers tested at KEMA Laboratories in February 1992 failed because of "air-gap flashovers," a problem the Board reasonably concluded was unrelated to the insulation gap. In addition, at least one transformer that was known to be free of the misplaced insulation problem failed the extended applied voltage tests performed in the Manassas warehouse.[4]

Kingston also contests the Board's factual finding that the transformers incurred an excessive failure rate. Kingston points out that only one unit failed the tests required by the contract and only one unit failed after installation. All other failures, Kingston argues, were the result of noncomparable, extra-contractual testing and thus could not be the basis for rejection of the transformers.

This argument is without merit. Even if the tests were not expressly called for by the contract, WMATA had the right to require noncontractual testing in view of the problems identified by contractual testing. WMATA's basis for demanding additional tests was further strengthened when the explosion of the first installed transformer—which had passed all contractually-specified testing—cast serious doubt on the reliability of the contractual tests. It cannot seriously be asserted that WMATA was required to ignore defects, whether identified through contractual tests or otherwise. Clearly, the contract clearly did not require WMATA to accept transformers of questionable reliability.

In sum, the Board's factual findings that the transformers had more than one defect and incurred an excessive number of tests failures are supported by substantial evidence.

2. *Kingston's Assertion that the Board Committed Errors of Law in Refusing to Apply the Economic Waste Doctrine and in Refusing to Sever the Contract*

Kingston asserts that WMATA should have allowed it to inspect and repair the transformers and that its refusal to do so was economic waste which should not be sanctioned. Alternatively, Kingston argues that, even if WMATA had the right to refuse to accept repair of the defective transformers, the Board should have required WMATA to accept the eleven transformers which "had passed all applicable tests and were of potentially acceptable quality." 95–2 BCA ¶ 27,-841 at 138,848.

■ The Court sustains the Board's conclusion that the facts of this case do not require application of the economic waste doctrine. The inspection and repair methods proposed by Kingston required cutting into the structure of the transformer and could have shortened the life of the transformers. Thus, Kingston's proposed "cure" may have remedied one defect but created another.

■ Under the economic waste doctrine, WMATA would be required to accept repair rather than replacement of the transformers only if repair would provide a product which is "adequate for its intended purpose." *See*

---

4. Kingston attacks the Manassas tests as being both outside the contract and unreliable. Specifically, Kingston notes that there is a lack of evidence regarding the condition of the tested transformers, the quality of the testing equipment, and the surrounding environmental conditions. These arguments ignore the fact that the tests were initiated and arranged by Kingston and PEI, and that Kingston did not object to the validity of the tests at the time.

Kingston's post-hoc attempt to claim that the unit did not fail is similarly unpersuasive. The record is clear that the test indicated deficiencies such as "arcing." Contemporaneous with the testing, both Kingston and PEI treated the "arcing" units as failed units in need of repair. In addition, the record contains expert testimony that "arcing" in a transformer is a failure. *See* Transcript at 1150, 1646.

*Granite Constr. Co. v. United States,* 962 F.2d 998, 1007 (Fed.Cir.1992), *cert. denied,* 506 U.S. 1048, 113 S.Ct. 965, 122 L.Ed.2d 121 (1993). Clearly, a proposed repair which may have undermined the structural integrity of the unit would not have given WMATA a product "adequate for its intended purpose." WMATA had further justification for demanding that Kingston replace rather than repair the transformers since at least one "repaired" transformer completely failed to function upon installation.

■ The transformers' dismal record of repeated failures calls into significant doubt the reliability of all 22 units as well as the tests utilized to identify defects. Given WMATA's reasonable need for absolute reliability of the transformers, WMATA certainly was justified in rejecting the entire lot. There is nothing wrong with a public transportation authority being meticulous about the integrity of the products used in its transit system.

### 3. Kingston's Assertion that the Board Committed an Error of Law in Partially Enforcing the Liquidated Damages Clause

Kingston also challenges the Board's decision to enforce in part the liquidated damages clause, by reducing the liquidated damages to $500 from $1,000 per day for unexcused delay. Kingston claims that, once the Board determined that the amount of liquidated damages was unreasonable at the time of contract formation, its only alternative was to strike the liquidated damages clause as an unenforceable penalty. Kingston contends it was improper for the Board to reform the contract to substitute a liquidated damages amount found by the Board to be reasonable. The Court concurs.

The Board found that WMATA's estimate of liquidated damages was increased from $500 to $1,000 per day as a contingency against a possible Environmental Protection Agency penalty. This was so even though WMATA knew that the penalty would not be

assessed. 95–2 BCA ¶ 27,841 at ¶ 138,850. The Board concluded that "the appropriate daily rate for assessment of liquidated damages should be $500 ..." *Id.*

■■ The law is clear that a liquidated damage clause must be stricken as an unenforceable penalty where the amount is not a reasonable forecast of expected damages. *See, e.g., Mega Constr. Co., Inc. v. United States,* 29 Fed.Cl. 396, 502 (1993); *Appeal of Coliseum Construction, Inc.,* ASBCA No. 36642, 89–1 BCA ¶ 21,428, 1988 WL 142359 (1988). Where a liquidated damage clause is stricken, only actual damages may be recovered. *See, e.g., Rattigan v. Commodore Int'l, Ltd.,* 739 F.Supp. 167, 169 (S.D.N.Y.1990) ("[W]hen a court strikes the [liquidated damage] clause as a penalty, the prevailing party is limited to actual damages proven."); *Drillers, Inc.,* EBCA 358–5–86, 90–3 BCA ¶ 23,056, 1990 WL 83322 (1990) (awarding actual damages where liquidated damages provision was unenforceable).

■ Because WMATA knew at the time the contract was formed that the EPA penalties at issue would not be assessed against WMATA, it was unreasonable to include estimated penalties in calculating the liquidated damages amount. Therefore, the contractual clause providing for liquidated damages must be struck down as an unenforceable penalty. Because the Board revised the amount of liquidated damages, the Board did not consider what amount of damages were actually incurred.[5] Accordingly, the Court will remand the case to the Board for the sole purpose of determining what amount, if any, of actual damage WMATA incurred as a result of the unexcused delays in contract completion.

An appropriate Order accompanies this Memorandum Opinion.

### ORDER

This matter comes before the Court on cross motions for summary judgment and on defendant's motion to strike plaintiff's state-

5. WMATA argues that there is evidence in the record to suggest that actual damages were in excess of $1,000 per day. However, it does not

appear that the Board considered this evidence or made a determination of what if any actual damages were incurred.

ment of undisputed facts. For the reasons stated in the foregoing opinion, it is hereby

**ORDERED** that defendant's motion to strike plaintiff's statement of undisputed facts be **GRANTED;** and it is

**FURTHER ORDERED** that plaintiff's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART.** Plaintiff's motion is **GRANTED** with respect to its request that this Court hold that the Corps of Engineers Board of Contract Appeals committed an error of law in partially enforcing the contract's liquidated damage provision; and it is DENIED with respect to the remaining claims; and it is

**FURTHER ORDERED** that defendant's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART.** Defendant's motion is **DENIED** with respect to its request that the Court uphold the decision of the Corps of Engineers Board of Contract Appeals regarding enforceability of the liquidated damage clause; and it is **GRANTED** with respect to all remaining claims; and it is

**FURTHER ORDERED** that, except with respect to the liquidated damage provision, the decision of the Corps of Engineers Board of Contract Appeals is **AFFIRMED;** and it is

**FURTHER ORDERED** that the above captioned case be remanded to the Corps of Engineers Board of Contract Appeals for consideration of the amount of actual damages which WMATA incurred due to the unexcused delay in contract completion.